## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| STATE OF LOUISIANA, | * | CIVIL ACTION NO. 3:19-cv-00638 |
| By and through its Attorney General, | * | |
| JEFF LANDRY | * | JUDGE SHELLY D. DICK |
| | * | |
| Plaintiff, | * | MAGISTRATE JUDGE |
| | * | RICHARD L. BOURGEOIS, JR. |
| VERSUS | * | |
| | * | |
| BANK OF AMERICA, N.A., et al., | * | |
| | * | |
| Defendants. | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## STIFEL, NICOLAUS & CO., INC.'S MEMORANDUM OF LAW IN SUPPORT OF
## MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT

## TABLE OF CONTENTS

**Page**

SUMMARY OF ARGUMENT .................................................................................................... 1

BACKGROUND ...................................................................................................................... 4

ARGUMENT ........................................................................................................................... 7

I.     PLAINTIFF'S SHERMAN ACT CLAIM FAILS BECAUSE THERE ARE NO
       ALLEGATIONS THAT STIFEL PARTICIPATED IN THE CONSPIRACY .............. 8

       A.     Plaintiff Fails to Allege Any Direct Evidence of Stifel's Participation in the
              Alleged Conspiracy................................................................................................ 9

       B.     Plaintiff Fails to Allege Circumstantial Evidence of Concerted Action Involving
              Stifel. ..................................................................................................................13

II.    PLAINTIFF'S LUTPA CLAIM AGAINST STIFEL LIKEWISE FAILS.....................16

III.   PLAINTIFF FAILS TO STATE A CLAIM FOR NEGLIGENCE.................................19

CONCLUSION.......................................................................................................................22

## **TABLE OF AUTHORITIES**

*Page(s)*

### **Cases**

*Abbott Labs.* v. *Adelphia Supply USA*,
   2017 WL 5992355 (E.D.N.Y. Aug. 10, 2017)........................................................................15

*In re Beef Indus. Antitrust Litig. MDL Docket No. 248*,
   907 F.2d 510 (5th Cir. 1990) ..............................................................................................15

*Benchmark Elec. Inc.* v. *J.M. Huber Corp.*,
   343 F.3d 719 (5th Cir. 2003) ..............................................................................................18

*Bombet* v. *Donovan*,
   2015 WL 65255 (M.D. La. Jan. 5, 2015)..............................................................................17

*Bona Fide Conglomerate, Inc.* v. *SourceAmerica*,
   691 F. App'x 389 (9th Cir. 2017) ........................................................................................15

*Bowman* v. *City of Baton Rouge/Par. of E. Baton Rouge*,
   2002-1376, (La. App. 1 Cir. 5/9/03), 849 So. 2d 622, *writ denied*, 2003-1579
   (La. 10/3/03), 855 So. 2d 315 ..............................................................................................20

*Brand Coupon Network, LLC v. Catalina Mktg. Corp.*,
   2014 WL 6674034 (M.D. La. Nov. 24, 2014) .......................................................................18

*Capital Imaging Assocs., P.C.* v. *Mohawk Valley Med. Assocs., Inc.*,
   996 F.2d 537 (2d Cir. 1993)................................................................................................15

*Carpenter* v. *Webre*,
   2018 WL 1453201 (E.D. La. Mar. 23, 2018) ..................................................................8, 13

*Concord Assocs., L.P.* v. *Entm't Properties Tr.*,
   2014 WL 1396524 (S.D.N.Y. Apr. 9, 2014), *aff'd*, 817 F.3d 46 (2d Cir. 2016) ......................8

*Davis* v. *Bayless*,
   70 F.3d 367 (5th Cir. 1995) ................................................................................................16

*Ferguson* v. *Extraco Mortg. Co.*,
   264 F. App'x 351 (5th Cir. 2007) ..........................................................................................1

*First Am. Bankcard, Inc.* v. *Smart Bus. Tech., Inc.*,
   178 F. Supp. 3d 390 (E.D. La. 2016)............................................................................ *passim*

*Fox* v. *Lifemark Sec. Corp.*,
   84 F. Supp. 3d 239 (W.D.N.Y. 2015) ...................................................................................21

*Golden Bridge Tech., Inc.* v. *Motorola, Inc.*,
   547 F.3d 266 (5th Cir. 2008) ................................................................10

*Grodner & Assocs., APLLC* v. *Regions Bank*,
   338 F. Supp. 3d 488 (M.D. La. 2018) (Dick, J.), *aff'd*, 766 F. App'x 12 (5th
   Cir. 2019) ..........................................................................................20

*In re GSE Bonds Antitrust Litig.*,
   396 F. Supp. 3d 354 (S.D.N.Y. 2019).....................................................14

*In re GSE Bonds Antitrust Litig.*,
   Case No. 19-cv-1704, Dkt. No. 254 (S.D.N.Y. Sept. 10, 2019)...................... *passim*

*Guimmo* v. *Albarado*,
   99-286 (La. App. 5 Cir. 7/27/99), 739 So. 2d 973 ..................................20

*In re Iowa Ready-Mix Concrete Antitrust Litig.*,
   768 F. Supp. 2d 961 (N.D. Iowa 2011).....................................................12

*Lemann* v. *Essen Lane Daiquiris, Inc.*,
   2005-1095, 923 So. 2d 627, 633 .............................................................19

*Mariche v. Wells Fargo Bank, N.A.*,
   2012 WL 1057626 (E.D. La. Mar. 28, 2012) ...........................................16

*Marucci Sports, LLC* v. *NCAA*,
   751 F.3d 368 (5th Cir. 2014) ...........................................................12, 15

*Meany* v. *Meany*,
   94-0251 (La. 7/5/94), 639 So. 2d 229 .....................................................20

*Mraz* v. *JPMorgan Chase Bank, N.A.*,
   2018 WL 2075427 (E.D.N.Y. May 3, 2018) .............................................21

*Norris* v. *Hearst Tr.*,
   500 F.3d 454 (5th Cir. 2007) ...................................................................8

*In re Optical Disk Drive Antitrust Litig.*,
   2011 WL 3894376 (N.D. Cal. 2011) .......................................................12

*Pinero* v. *Jackson Hewitt Tax Serv. Inc.*,
   594 F. Supp. 2d 710 (E.D. La. 2009).......................................................17

*In re Pool Prod. Distribution Mkt. Antitrust Litig.*,
   988 F. Supp. 2d 696 (E.D. La. 2013).......................................................13

*In re Pool Prods. Distrib. Mkt. Antitrust Litig.*,
   158 F. Supp. 3d 544 (E.D. La. 2016).................................................10, 12

*Quality Envtl. Processes, Inc.* v. *I.P. Petroleum Co.*,
  2013-1582 (La. 5/7/14), 144 So. 3d 1011 ...............................................................17

*Rios* v. *City of Del Rio, Tex.*,
  444 F.3d 417 (5th Cir. 2006) ...................................................................................7

*Truong v. Bank of Am., N.A.*,
  717 F.3d 377 (5th Cir. 2013) .................................................................................16

*Turner* v. *Purina Mills, Inc.*,
  989 F.2d 1419 (5th Cir. 1993) ...............................................................................18

*Van Hoose* v. *Gravois*,
  2011–0976 (La. App. 1 Cir. 7/7/11), 70 So.3d 1017 ...........................................19

*Walker* v. *Beaumont Indep. Sch. Dist.*,
  938 F.3d 724 (5th Cir. 2019) ...................................................................................8

## Statutes

La. R.S. 6:1124 ..............................................................................................................20, 21

La. R.S. 51:1405(A) .............................................................................................................17

La. Stat. Ann. § 51:1406(1) .................................................................................................16

Sherman Act, 15 U.S.C. § 1 ....................................................................................... *passim*

Defendant Stifel, Nicolaus & Co., Inc. ("Stifel"), respectfully submits this memorandum of law in support of its motion under Fed. R. Civ. P. 12(b)(6) to dismiss with prejudice the claims against it in the Second Amended Complaint for Damages (Dkt. No. 130) (the "SAC") filed by Plaintiff State of Louisiana ("Plaintiff").

## SUMMARY OF ARGUMENT

Plaintiff's SAC is almost entirely a copy of a class action complaint filed in the Southern District of New York, in which Stifel is not named as a defendant.  *In re GSE Bonds Antitrust Litig.*, Case No. 19-cv-1704, Dkt. No. 254 (S.D.N.Y. Sept. 10, 2019) (the "New York Action").[1] To the extent Plaintiff's SAC here alleges the basic elements of an antitrust violation at all— elements like size, market share and power, and pricing—those allegations are lifted from the complaint in the New York Action that expressly make clear they refer to an analysis of the purported conduct of entities other than Stifel.  In at least one instance, Plaintiff copies from the New York complaint an allegation contrasting the allegedly unlawful prices charged by the defendants in the New York Action with the prices charged by "non-Defendant Approved GSE Bond Dealers" like Stifel, thereby affirmatively contradicting any antitrust claim against Stifel. (*See* SAC ¶ 227; NY Cmpl. ¶ 223 & Fig. 4.)[2]

---

[1]    A copy of the Third Consolidated Amended Class Action Complaint in the New York Action is attached as Exhibit A (the "NY Cmpl.").  As a publicly filed litigation pleading, the Court may take judicial notice of it on this motion.  *See Ferguson* v. *Extraco Mortg. Co.*, 264 F. App'x 351, 352 (5th Cir. 2007) ("A court may take judicial notice of 'a document filed in another court . . . to establish the fact of such litigation and related filings . . . .'" (citation omitted)).

[2]    For reasons that cannot be explained for any reason other than because it makes clear that Defendants' copy-cat allegations relate to entities other than Stifel and the several other defendants who were not parties to the New York Action, the SAC refers expressly to "Figure 4" (and elsewhere "Figure 3" and "Figure 5"), but the SAC omits the charts that constitute those Figures, which are set out in the New York complaint.  (*Compare* SAC ¶¶ 227-28 *with* NY Cmpl. ¶¶ 223-24; SAC ¶ 222 *with* NY Cmpl. ¶ 218; SAC ¶ 245 *with* NY Cmpl. ¶ 241.)

Relying fundamentally on the analysis and allegations in New York, Plaintiff contends that Defendants were authorized dealers of government sponsored entity ("GSE") bonds that bought the bonds from the GSE issuers in syndicate sub-groups, and distributed them to investors. Although Plaintiff does not claim that Defendants' communications and actions during the syndication process were unlawful, Plaintiff contends that, as the syndication period was ending, Defendants conspired with one another to set the post-syndication price of the bonds—known as the "free to trade" or "FTT" price—at excessive levels and that Defendants engaged in this anticompetitive conduct with respect to thousands of different bonds issued from 2009 to 2016.

As to Stifel, what is missing from the SAC are any allegations that come close to meeting the standard for pleading the elements of participation in such a massive antitrust conspiracy. Repetition of the allegations from the New York Action provide none because, even as repeated in the SAC here, those allegations and the analysis supporting them do not involve Stifel. For example, the SAC's attempt to allege market power—lifted entirely from the New York Action— states "[t]he table and figures below demonstrate Defendants' market control" and alleges "[t]his high degree of concentration in the GSE issuance process gave Defendants substantial control over the GSE Bond supply available to investors in the secondary market." (SAC ¶¶ 136-37.) The chart Plaintiff includes in the SAC then identifies 16 Defendants and their purported individual and collective market shares—however, Stifel is not included or otherwise referenced. (*See id.*)

This is but one example: the SAC is devoid of any factual allegations evidencing substantive involvement by Stifel in the matters that form the basis of the New York complaint, and fails completely to allege wrongdoing by Stifel. There are no factual allegations about the extent of Stifel's involvement in GSE bond underwriting during the 2009 through 2016 period; the extent of its involvement in secondary market trading during that period; or the prices charged by

Stifel in selling any GSE bond to anyone, much less any analysis or factual basis to allege that it charged supra-competitive prices for any GSE bonds it sold.  And the SAC contains no factual allegations from which it could be concluded that Stifel entered into a conspiracy with this broad group of allegedly market-dominant Defendants or when or how it did so.  Given that Plaintiff has now amended its complaint in this case twice, if it had any such facts to allege it was surely incumbent upon Plaintiff to have done so by now.

The SAC contains one alleged chatroom discussion from one day in June 2013 between a trader from Stifel and a trader from Mizuho Securities USA, LLC ("Mizuho"), an entity that was also not a defendant in the New York Action, involving a single unidentified GSE bond.  (SAC ¶ 183.)  Notably, Plaintiff never alleges that it purchased the bond at issue or suffered damages as a result.  It also does not allege how this single interaction between two entities that were not part of the conspiracy alleged in the New York Action connects them with other Defendants or provides a basis for alleging Stifel's broader involvement in the six-year conspiracy alleged in the New York Action.  Nor does Plaintiff ever explain how anything in the discussion between Mizuho and Stifel is improper.  While Plaintiff attempts to portray this single discussion broadly as an "agree[ment] to declare a GSE Bond FTT at a supracompetitive fixed price," on its face this is a discussion between bond underwriters *during the syndication period* concerning the cost at which they may purchase additional GSE bonds from the issuer and thus "upsize" their purchase.  (*See* SAC ¶ 183.)  Plaintiff nowhere claims that discussions of this nature are inappropriate or even relate to the subject of the conspiracy it seeks to allege.  Plaintiff's Sherman Act claim against Stifel therefore fails.

Plaintiff's LUTPA claim against Stifel is equally defective, but for different reasons.  *First,* Stifel is exempt from LUTPA claims because it is licensed by the Louisiana Office of Financial

Institutions and is affiliated with a federally-insured financial institution. *Second,* even if Plaintiff's claim could be brought against Stifel, its LUTPA claim rests on allegations that Stifel made misrepresentations concerning its experience and skill, and is therefore subject to the heightened pleading standards of Federal Rule of Civil Procedure 9(b). Plaintiff does not begin to comply with those heightened pleading standards.

Plaintiff's negligence claim likewise fails. The SAC is devoid of any allegations establishing that Stifel owed Plaintiff a legally cognizable duty of care, an essential element of its negligence claim. As at most arm's length counterparties, Stifel owed no fiduciary or other duties to Plaintiff. Plaintiff also fails to plead facts showing that Stifel knew of or should have known about the alleged conspiracy, in which Plaintiff has failed to plead Stifel participated.

Plaintiff's SAC—its third strike—should therefore be dismissed with prejudice as to Stifel.

## BACKGROUND

Like the prior complaints Plaintiff filed, the SAC is a largely verbatim copy of the New York Complaint. The gravamen of the SAC is that Defendants—who are "horizontal competitors in the GSE Bond market" and "the largest underwriters in the primary market involved in the process that GSEs use to issue debt . . . and the largest dealers of GSE Bonds to investors in the secondary market"—"agreed to inflate and/or maintain artificial prices for GSE Bonds throughout the Time period between 2009 and 2016." (SAC ¶¶ 4, 6.) But Stifel is not alleged in the New York complaint to be one of those largest underwriters or one of those largest dealers, and Plaintiff's SAC supplies none of the missing factual allegations.

As a consequence of Plaintiff's almost total reliance on the New York complaint, the allegations concerning Stifel in the SAC remain few and far between. The SAC does not contain any factual allegations about the extent of Stifel's involvement in GSE bond underwriting or in secondary market trading during the 2009 through 2016 period. It contains no allegations

concerning the prices charged by Stifel in selling any GSE bond to Plaintiff or anyone else. Although Plaintiff asserts that "Defendants as a bloc dominated control of GSE Bond supply and were well-positioned to use that dominant position to fix the prices of GSE Bonds charged to Plaintiffs and the Class [sic]," that allegation is lifted from the New York Action and the table that provides market share information and purportedly "demonstrate[s] Defendants' market control" does not refer to Stifel but only to the defendants in the New York Action.  (SAC ¶ 136 & Table 1; NY Cmpl. ¶ 135 & Table 1.)[3]

Nor do the allegations concerning Plaintiff's analyses of Defendants' GSE pricing and other data implicate Stifel in any purported price-fixing conspiracy between 2009 and 2016. Because these allegations were copied from the New York complaint and the analyses the lawyers there did to support those allegations, the "Defendants" to whom those allegations refer do not include non-parties like Stifel.  For example, as the allegations themselves make clear, any purported data indicating that "Defendants" inflated GSE bond prices during the relevant period do not include a review of Stifel's pricing and thus is not a basis to support a claim against Stifel.[4] Similarly, and perhaps more fatally for Plaintiff, the allegation in the SAC that a comparison

---

[3]    *See also* SAC ¶ 6 (list of defendants "directly implicated in conspiratorial multi-bank chats regarding pricing in the secondary market for GSE Bonds" does not include Stifel); NY Cmpl. ¶ 4.

[4]    *Compare* SAC ¶¶ 215-17 *with* NY Cmpl. ¶¶ 210-13 (alleging that the price that Defendants charged investors for newly issued Notes on offer days were ***nine times higher*** before January 1, 2016 than after"); *compare* SAC ¶ 221 *with* NY Cmpl. ¶ 216 (alleging that "analysis showed that each Defendant charged significantly higher prices for newly issued GSE Bonds it sold to investors Between [sic] 2009 and 2016 compared to after January 1, 2016"); *compare* SAC ¶ 235 *with* NY Cmpl. ¶ 231 (alleging that "isolat[ion] [of] Defendants' price inflation of Notes about to go off-the-run" shows "that the price inflation for Notes about to go off-the-run only occurred in transactions involving ***customers***"); *compare* SAC ¶ 249 *with* NY Cmpl. ¶ 245 (alleging that "the average relative bid-ask spread in Defendants' GSE Bond quotes Between 2009 and 2016 . . . was ***90% wider*** than the average relative bid-ask spread in Defendants' GSE Bond quotes after the Time period between 2009 and 2016").

between the GSE bond prices of Defendants and non-Defendant GSE bond dealers before and after January 1, 2016 demonstrates that Defendants inflated their prices actually *undermines* Plaintiff's effort to state a claim against Stifel.  (SAC ¶¶ 227-28.)  Because this analysis and allegation was likewise copied from the New York SAC (*see* NY Cmpl. ¶¶ 223-24 & Figure 4), as a "Non-Defendant Approved GSE Bond Dealer" Stifel's pricing was among those being contrasted to support claims of allegedly improper pricing by the New York defendants.  Simply put, Plaintiff's effort to plead a claim in this Court by copying the allegations in the New York complaint provides no factual basis for any claim as to Stifel.

Plaintiff alleges that it purchased GSE bonds from Stifel, but other than the conclusory assertion that they were purchased at supra-competitive prices as a result of the claimed conspiracy, Plaintiff alleges next to nothing about what specific bonds it purchased, or under what circumstances.  (SAC ¶¶ 90-91, 267, 274, 280.)  The only specific allegation in the SAC concerning Stifel purports to quote a June 4, 2013 chatroom discussion involving a Stifel trader and a trader from Mizuho, allegedly concerning GSE bonds.  (*Id.* ¶ 183.)  Plaintiff asserts that the chat reflects an agreement by traders from "Stifel Nicolaus & Co, and Mizuho Securities, US . . . to declare a GSE Bond FTT at a supracompetitive price."  (*Id.*)  Plaintiff does not allege that it purchased any of the GSE bond discussed in the chat.  Nor does the SAC allege a single chat or other communication between Stifel and any of the defendants in the New York Action.

The SAC also does not contain any allegation to explain how the alleged chat reflects a price-fixing conspiracy.  The transcript does not suggest that the underwriting syndicate involving Stifel and Mizuho had ended, and Plaintiff concedes that communications among underwriters during that period are proper.  (*See* SAC ¶ 130 (recognizing that communications between members of a syndicate working to place bonds in the "primary market" are "permitted").)  More

importantly, on its face the alleged chat relates to the price at which the underwriters might *purchase* additional bonds *from the issuer* to upsize the offering: the Stifel and Mizuho traders discuss "run[ning] an upsize cost" and agree to "wait til [the price] g[ets] back to 99.85" from the then-current, higher price of "99.87" to purchase additional bonds from the issuer. (*Id*. ¶ 183.) As Plaintiff acknowledges, members of a syndicate may "upsize" their position by purchasing additional bonds from the GSE issuer. (*See id.* ¶ 176 (alleging that other defendants "'upsize[d]' their position, purchasing an additional $50 million in GSE Bonds from Fannie Mae at a price of $99.85" during the syndicate phase, and subsequently declared them FTT).) A communication about enlarging an offering to buy additional bonds at a lower price from the issuer has nothing to do with alleged supra-competitive prices in the secondary trading market.

The remaining factual allegations specific to Stifel in the SAC are generic: (1) that Stifel is an investment company "organized under the laws of the State of Missouri, with its principal place of business in St. Louis, Missouri" (SAC ¶ 89); (2) that it is "a registered broker-dealer with the SEC and FINRA, and is licensed to do business in all 50 states" (*id.*); (3) that it was an approved "dealer[] for debt securities issued by Fannie Mae, Freddie Mac, FHLB, and FFCB between 2009 and 2016" (*id.* ¶ 108; *see also id.* ¶ 90); and (4) that it transacted in GSE bonds with Plaintiff (*id.* ¶¶ 91, 267, 274, 280). None of these allegations provides a basis for Plaintiff's claims.

## ARGUMENT

To survive a Rule 12(b)(6) motion, "the complaint must contain either direct allegations on every material point necessary to sustain a recovery" or "contain allegations from which an inference fairly may be drawn that evidence on these material points will be introduced at trial." *Rios* v. *City of Del Rio, Tex.*, 444 F.3d 417, 420-21 (5th Cir. 2006) (quotations and citation omitted). "Dismissal is proper if the complaint lacks an allegation regarding a required element necessary to obtain relief." *Id*. (quotations and citation omitted). "Where the well-pleaded facts

of a complaint do not permit a court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Walker* v. *Beaumont Indep. Sch. Dist*., 938 F.3d 724, 734 (5th Cir. 2019) (quoting *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009)).

## I.    PLAINTIFF'S SHERMAN ACT CLAIM FAILS BECAUSE THERE ARE NO ALLEGATIONS THAT STIFEL PARTICIPATED IN THE CONSPIRACY

"To establish a Sherman Act violation under § 1, a plaintiff must demonstrate that: '(1) [the defendants] engaged in a conspiracy, (2) the conspiracy had the effect of restraining trade "among the several States, or with foreign nations," and (3) trade was restrained in the relevant market.'" *Carpenter* v. *Webre*, 2018 WL 1453201, at *15 (E.D. La. Mar. 23, 2018) (quoting *Apani Sw., Inc.* v. *Coca–Cola Enters., Inc*., 300 F.3d 620, 627 (5th Cir. 2002)). "To satisfy the first element, that the defendants conspired to restrain the plaintiff's trade, Plaintiffs must show that the defendants engaged in concerted action, defined as having a conscious commitment to a common scheme designed to achieve an unlawful objective." *Id.* (internal quotations and citation omitted). "Concerted action may be shown by either direct or circumstantial evidence." *Id.*

As least as to Stifel, Plaintiff fails to plead either direct or circumstantial evidence in support of the first element of a Sherman Act claim. "To withstand a Rule 12(b)(6) motion, the complaint must allege 'more than labels and conclusions,' 'a formulaic recitation of the elements of a cause of action will not do' and '[F]actual allegations must be enough to raise a right to relief above the speculative level.'" *Norris* v. *Hearst Tr.*, 500 F.3d 454, 464 (5th Cir. 2007) (citing *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 555 (2007)) (alteration in original). "Group pleading . . . is simply insufficient to withstand review on a motion to dismiss" a Sherman Act conspiracy claim. *Concord Assocs., L.P.* v. *Entm't Properties Tr.*, 2014 WL 1396524, at *24 (S.D.N.Y. Apr. 9,

2014), *aff'd*, 817 F.3d 46 (2d Cir. 2016) (granting motion to dismiss antitrust claims with prejudice).

### A.    Plaintiff Fails to Allege Any Direct Evidence of Stifel's Participation in the Alleged Conspiracy.

The SAC is devoid of any factual allegations to support a claim that Stifel participated in a conspiracy to inflate prices in secondary market GSE bond trading as alleged by Plaintiff.  Unlike the allegations copied from the New York complaint that do not relate to Stifel, the SAC contains no allegations concerning the extent of Stifel's involvement in GSE bond underwriting during the 2009 through 2016 period (beyond the dollar amounts of bonds sold to and purchased from Plaintiff between July 2010 and June 2013 (SAC ¶ 267)); no allegations as to the extent of its involvement in secondary market trading during that period; and no allegations concerning the prices charged by Stifel in selling any GSE bond to anyone.  Absent allegations as to these fundamental matters, the SAC does not remotely state a Sherman Act conspiracy claim against Stifel.

The SAC contains a single substantive allegation as to Stifel—that a Stifel trader was involved in a June 2013 chat with a trader from Mizuho while part of a GSE bond syndicate.  (*See* SAC ¶ 183.)  The SAC does not allege that Plaintiff even purchased any bonds of the issue discussed in the chat.  Although Plaintiff asserts boldly that the chat suggests an agreement by Stifel to fix the secondary-market prices of GSE Bonds, it suggests nothing of the sort; on its face the chat is a discussion between bond underwriters regarding the price at which they were willing to "upsize" the offering—*i.e.*, increase the offering size by purchase additional bonds from the GSE bond issuer.  (*Id*.)  But even if Plaintiff's reading were plausible (it is not), Plaintiff fails to explain how a single chat with an someone who, like Stifel, was not a defendant in the New York

Action, supports claims of Stifel's ongoing involvement in a seven-year antitrust conspiracy, particularly given the paucity of any other factual allegations as to Stifel.

To qualify as direct evidence of a conspiracy, a communication must reflect an "explicit understanding between the [defendants] to collude." *Golden Bridge Tech., Inc.* v. *Motorola, Inc*., 547 F.3d 266, 272 (5th Cir. 2008) (holding that plaintiff had failed to establish "an explicit understanding to conspire," and affirming grant of summary judgment in favor of defendants). "[D]irect evidence cannot be ambiguous; rather, '[d]irect evidence is tantamount to an acknowledgment of guilt.'" *In re Pool Prods. Distrib. Mkt. Antitrust Litig.*, 158 F. Supp. 3d 544, 551 (E.D. La. 2016) (quoting *Hyland* v. *HomeServices of Am., Inc*., 771 F.3d 310, 318 (6th Cir. 2014)).  "Evidence of a conspiracy that depends on additional inferences is 'at most, circumstantial.'" *In re Pool Prods.*, 158 F. Supp. 3d at 551 (quoting *Viazis* v. *Am. Ass'n of Orthodontists*, 314 F.3d 758, 762 (5th Cir. 2002)).

The SAC, with its total absence of allegations concerning Stifel's GSE activities, contains no basis for alleging an explicit agreement by Stifel to collude, much less participate in a massive conspiracy allegedly spanning more than six years, and the single alleged chat with Mizuho does not provide it.  As the SAC recognizes, GSE bond underwriters, "often working together in a group called a 'syndicate' . . . try and place [] new GSE Bonds with a bulk buyer" in what is referred to as the "'primary market.'" (SAC ¶¶ 129-30.)  During the "'syndication' phase," the underwriters are "permitted to communicate with each other to effectuate the initial placement in the primary market." (*Id.* ¶ 130.)  The syndication phase ends only when the dealers have "declare[d] the new issuance 'free-to-trade,'" at which point "secondary market trading begins." (*Id.* ¶ 131.)

Putting aside that the alleged chat involving Stifel is a communication involving a GSE bond offering that Plaintiff does not even allege it purchased, the communication expressly relates

-10-

to the price at which the two underwriters would be willing to "upsize" the offering—*i.e.*, to purchase additional bonds from the issuer given that the market had moved since they were awarded the original bonds.  (*See id*. ¶ 183.)  Purchasing bonds from the GSE issuer is part of syndication, during which (as Plaintiff concedes) discussions between underwriters is permissible. (*See id.* ¶ 130.)  Although the Stifel trader purportedly asked a question concerning "FTT," the chat reflects that the bond was not yet free to trade and that Stifel and Mizuho were, to the contrary, discussing upsizing the offering and the price at which they were willing to purchase additional bonds to do so:

> Stifel Nicolaus Trader:
> u wanna run an upsize cost?
>
> Mizuho Securities Trader:
> [. . .] ran one and got back 99.87 .. was gonna wait til it got back to 99.85
>
> Mizuho Securities Trader:
> You cool w/ that?
>
> Stifel Nicolaus Trader:
> yes
>
> Stifel Nicolaus Trader:
> i agree

(*Id.* ¶ 183.)

Indeed, Plaintiff's suggestion that the exchange reflects a conspiracy to set the free to trade price in the secondary market makes little sense.  It is illogical that the traders would be "wait[ing]" on the cost of the GSE bonds to decrease from "99.87" to "99.85" if, as suggested, they were the ones setting the price, and would presumably wish to sell the GSE bonds at a higher rather than lower price in the secondary market.  (*See id.* ¶ 183.)  In contrast, it is perfectly logical that the syndicate would wait until the GSE bond price "got *back* to 99.85" (suggesting this was the price

at which it initially purchased the bonds) from the higher price of "99.87" before "upsiz[ing]" the purchase.  (*Id.* (emphasis added).)[5]

In short, in no way does this chat "set forth facts that demonstrate a 'meeting of the minds' between" Stifel and Mizuho as to any conspiracy relating to fixing the price of secondary market trading even as to this one bond.  Even if it were ambiguous (and it is not), it would not be sufficient to plead direct evidence of collusion even between Stifel and Mizuho.  *In re Pool Prods.,* 158 F. Supp. 3d at 551.  And under all circumstances, this exchange surely fails to establish direct evidence of any unlawful agreement between Stifel and any Defendant spanning broad conduct over almost seven years.  *See In re Iowa Ready-Mix Concrete Antitrust Litig.*, 768 F. Supp. 2d 961, 972 (N.D. Iowa 2011) (dismissing claim where plaintiffs "expressly relied on an 'overarching' conspiracy among all of them that simply is not supported by any factual allegations in the present Amended Consolidated SAC"); *In re Optical Disk Drive Antitrust Litig.*, 2011 WL 3894376, at *9 (N.D. Cal. 2011) (dismissing claim where allegations of sporadic conduct were "a far cry from establishing plausibility for a broad six year continuing agreement among all defendants to fix [] prices"); *see also Marucci Sports, LLC* v. *NCAA*, 751 F.3d 368, 379 (5th Cir. 2014) (plaintiff failed to plead a Sherman Act claim where the "allegations d[id] not make it plausible that the [defendants] adopted a conscious commitment to a common scheme designed to achieve an unlawful objective").

---

[5]    Unsurprisingly, the other allegations in the SAC concerning purported agreements between traders to set a free to trade price generally involve agreements to *increase* the price.  *See, e.g.*, SAC ¶ 151 (chat participants agreed to FTT price of "99.925" after "99.90" was initially suggested); *id.* ¶ 162 (chat participants agreed to FTT price of "100.02" after "100.018" was initially suggested); *id.* ¶ 163 (chat participants agreed to FTT price of "99.90" after "99.82" was initially suggested); *id.* ¶ 171 (chat participants agreed to FTT price of "99.98" after "99.975" was initially suggested).

-12-

### B. Plaintiff Fails to Allege Circumstantial Evidence of Concerted Action Involving Stifel.

Having failed to plead any claims reflecting direct evidence of conspiracy, Plaintiff must plead circumstantial evidence sufficient to support its claim. "[C]ircumstantial evidence requires additional inferences to support a conspiracy claim." *Carpenter*, 2018 WL 1453201, at *15-16 (granting motion to dismiss under Rule 12(b)(6) where the defendants' "individual acts and the circumstantial evidence Plaintiffs offer to demonstrate their concerted efforts do not support an inference that the parties conspired to restrain Plaintiffs' trade"). "Independent parallel conduct, or even conduct among competitors that is consciously parallel, does not alone establish the contract, combination, or conspiracy required by § 1." *Id.* at *15.

Moreover, when "the plaintiff relies on circumstantial evidence that the defendants engaged in concerted action, plus factors are generally necessary in order to plead a plausible Section 1 claim." *In re Pool Prod. Distribution Mkt. Antitrust Litig.*, 988 F. Supp. 2d 696, 711 (E.D. La. 2013). "Plus factors identified by courts and commentators include (1) actions that would be against the defendants' self-interest if the defendants were acting independently, but consistent with their self-interest if they were acting in concert; (2) a motive to conspire; [and] (3) an opportunity to conspire," among others. *Id.*[6] "A plausible allegation that the parallel conduct was not in the alleged conspirators' independent self-interest absent an agreement is generally considered the most important 'plus factor.'" *Id.* (citation omitted).

---

[6] Other recognized plus factors are "market concentration and structure conducive to collusion" "pretextual explanations for anticompetitive conduct," "sharing of price information," "signaling," and "involvement in other conspiracies." *Id.*

Because the SAC contains no specific factual allegations as to Stifel's activities in underwriting or trading GSE bonds, it necessarily fails adequately to plead circumstantial evidence of concerted action that could provide a basis for a Sherman Act claim.

*First,* Plaintiff has not pleaded the required parallel conduct. The SAC is devoid of factual allegations establishing that Stifel behaved in the same way as other Defendants allegedly did with respect to price-fixing in the secondary market. The SAC contains no factual allegations whatsoever as to Stifel's conduct or pricing in the secondary market for newly issued GSE bonds. The statistical and other analyses imported from the New York Action do not, as discussed above, purport to include Stifel (*see* SAC ¶¶ 209-250; NY Cmpl. ¶¶ 204-46), and in certain instances actually contrast the alleged pricing behavior of those defendants from the behavior of GSE approved bond dealers like Stifel who were not defendants in New York. (*See* SAC ¶ 227; NY Cmpl. ¶ 223 & "Figure 4.")[7] As also discussed, the chat between Stifel and Mizuho does not relate, even in that one isolated instance, to Stifel's behavior in the secondary market. (*See* SAC ¶ 183.) And even as to that single instance, Plaintiff does not allege the prices at which Stifel sold any of those GSE Bonds in the secondary market, allege any facts to show that any such prices were excessive, or allege that Stifel's prices were similar to the prices that other defendants set at the same time for the same products. Plaintiff thus fails to allege that Stifel participated in any

---

[7]    Moreover, in the New York Action, Judge Rakoff held that these same statistics "d[id] not plausibly suggest that the particular defendants named in [the New York] suit were part of that conspiracy" and that the analyses failed in places to "distinguish . . . between defendant and non-defendant dealers." *In re GSE Bonds Antitrust Litig.*, 396 F. Supp. 3d 354, 365 (S.D.N.Y. 2019). Even where the analyses did distinguish between defendants and others, Judge Rakoff found that "it is impossible to have any confidence that the statistics actually capture something different about <u>each and every</u> defendant." *Id.* It is even more implausible for Plaintiff to claim that analyses concerning "Defendants" in the New York Action capture anything about Stifel.

alleged uniform and consistent pricing of GSE bonds by Defendants, much less how and when it did so.[8]

  *Second,* because Plaintiff has failed to plead the existence of any parallel conduct, the Court need not consider whether Plaintiff has pleaded the existence of any plus factors. *See In re Beef Indus. Antitrust Litig. MDL Docket No. 248*, 907 F.2d 510, 514 (5th Cir. 1990) (when relying on circumstantial evidence of price-fixing, an antitrust plaintiff "must first demonstrate that the defendants' actions were parallel"); *Abbott Labs.* v. *Adelphia Supply USA*, 2017 WL 5992355, at *10 (E.D.N.Y. Aug. 10, 2017) ("A court need not reach the question of the sufficiency of the alleged plus factors where plaintiffs have in the first instance failed to adequately allege parallel conduct.") (citing *Beef Indus.*, 907 F.2d at 514); *Bona Fide Conglomerate, Inc.* v. *SourceAmerica*, 691 F. App'x 389, 391 (9th Cir. 2017) ("[Plaintiff's] 'plus factors' are [] irrelevant to determining whether the complaint made out a viable Section 1 claim" where plaintiff did "not plausibly allege[] any parallel conduct among the defendants."). Nevertheless, even if Plaintiff had pleaded parallel conduct (and it has not), its claims fail for the additional reason that Plaintiff fails to plead the existence of any "plus factor." Plaintiff does not allege that Stifel acted against its own self-interest in the sale of GSE bonds. Moreover, even if the "opportunity to conspire" is a relevant factor, "[t]he mere opportunity to conspire does not by itself support the inference that such an illegal combination actually occurred." *Capital Imaging Assocs., P.C.* v. *Mohawk Valley Med. Assocs., Inc*., 996 F.2d 537, 545 (2d Cir. 1993).

---

[8]  A non-conspirator's sale of its product at a market price allegedly artificially inflated by others does not create antitrust liability for the non-conspirator. *See Marucci*, 751 F.3d at 375 (allowing defendants' motion to dismiss where the complaint did not allege any "specific facts demonstrating an intention on the part of [defendants], or any other party to engage in a conspiracy").

For all of these reasons, the SAC wholly fails to plead a claim against Stifel under Section 1 of the Sherman Act and that claim should, once and for all, be dismissed.

## II.    PLAINTIFF'S LUTPA CLAIM AGAINST STIFEL LIKEWISE FAILS

Plaintiff's LUTPA claim against Stifel is also woefully deficient and subject to dismissal.

*First,* Plaintiff's claim is barred by LUTPA's exemptions for financial institutions directly or indirectly regulated by federal and Louisiana agencies—a flaw that cannot be cured by amendment.   LUTPA does not apply to "[a]ny federally insured financial institution, its subsidiaries, and affiliates or any licensee of the Office of Financial Institutions, its subsidiaries, and affiliates . . . or federal banking regulators who possess authority to regulate unfair or deceptive trade practices."   La. Stat. Ann. § 51:1406(1).   "The purpose of this exemption is 'to avoid duplication and exclude financial institutions which are regulated by other authorities as to unfair or deceptive trade practices.'"   *Mariche v. Wells Fargo Bank, N.A.*, 2012 WL 1057626, at *2 (E.D. La. Mar. 28, 2012) (citation omitted).   Financial institutions are broadly exempted by this provision no matter the capacity in which they act.   *See Truong v. Bank of Am., N.A.*, 717 F.3d 377, 387 (5th Cir. 2013) ("The Louisiana Legislature has decided that [the] LUTPA should not apply to '[a]ny federally insured financial institution, its subsidiaries, and affiliates,' and has not set out ***any*** exception to this broad rule." (second alteration in original) (emphasis added) (quoting La. Rev. Stat. § 51:1406(1))).

Stifel falls squarely within LUTPA's exemption for affiliates of federally insured financial institutions, as its affiliate, Stifel Bank and Trust, is a federally-insured bank.[9]   Moreover, Stifel is

---

[9]    *See    FDIC    Insured    Bank    Search    Tool,* https://research2.fdic.gov/bankfind/detail.html?bank=57311&name=Stifel%20Bank%20and%20 Trust&searchName=stifel&searchFdic=&city=&state=&zip=&address=&searchWithin=&active Flag=&searchByTradename=false&tabId=2 (last visited July 27, 2020).   The Court may take judicial notice of public records, including government websites, for the purpose of a Rule 12(b)(6) motion.   *Davis* v. *Bayless*, 70 F.3d 367, 372 n.3 (5th Cir. 1995) (holding that taking notice of public

exempted by LUTPA's provisions barring claims against financial institutions licensed by the Louisiana Office of Financial Institutions.  Plaintiff expressly pleads that Stifel is a licensed broker dealer in Louisiana.  (SAC ¶ 89.)[10]  Thus, LUTPA itself provides categorical barriers to asserting a claim against Stifel, which requires that the LUTPA claim be dismissed with prejudice.

*Second*, even if the LUTPA claim were not barred by LUTPA's exemptions for financial institutions directly or indirectly regulated by federal and Louisiana agencies (and it is), Plaintiff still fails to state a claim as to Stifel.  LUTPA prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."  La. R.S. 51:1405(A).  "'[T]he range of prohibited practices under LUTPA is extremely narrow,' as LUTPA prohibits only fraud, misrepresentation, and similar conduct, and not mere negligence."  *Quality Envtl. Processes, Inc.* v. *I.P. Petroleum Co.*, 2013-1582, p. 21 (La. 5/7/14), 144 So. 3d 1011, 1025 (quoting *Cheramie Servs., Inc.* v. *Shell Deepwater Prod., Inc*., 2009-1633, p. 10 (La. 4/23/10), 35 So. 3d 1053, 1060) (alteration in original).

In support of Plaintiffs' LUTPA claim, the SAC asserts that Stifel and other Defendants "engaged in deceptive business practices regarding the advertisement of their brokerage services, including making false statement regarding the use of their experience and skill in recommending investments."  (SAC ¶ 291.)  Where, as here, a "LUTPA claim is based on defendants' allegedly fraudulent misrepresentation, plaintiff's LUTPA claim must meet the heightened pleading requirements of Rule 9(b)."  *Pinero* v. *Jackson Hewitt Tax Serv. Inc.*, 594 F. Supp. 2d 710, 721

---

record documents is appropriate in a Rule 12(b)(6) motion); *Bombet* v. *Donovan*, 2015 WL 65255, at *7-8 (M.D. La. Jan. 5, 2015) (Dick, C.J.) (taking judicial notice of website and corporate status).

[10]    *See also FINRA BrokerCheck Report: Stifel, Nicolaus & Co., Inc., CRD # 793*, https://files.brokercheck.finra.org/firm/firm_793.pdf (last visited July 27, 2020) (showing that Stifel has been registered as a broker dealer in Louisiana since April 20, 1983).

(E.D. La. 2009); *see also Brand Coupon Network, LLC v. Catalina Mktg. Corp.*, 2014 WL 6674034, at *5 (M.D. La. Nov. 24, 2014) (same) (citation omitted).

The SAC fails to meet the high bar of Rule 9(b), which requires Plaintiff to allege the "particulars of time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *Benchmark Elec. Inc.* v. *J.M. Huber Corp.*, 343 F.3d 719, 724 (5th Cir. 2003) (citation omitted). Other than pointing to broad statements on Stifel's website describing its business—including that "solid, studied advice has been the hallmark of Stifel's approach" and that Stifel is "ready to help your organization" (SAC ¶ 281)—Plaintiff does not allege a single representation made specifically to it by Stifel, much less any representation by Stifel directed to GSE bonds. Even as to the generic website statements, Plaintiff does not allege with the required particularity how these statements were false or that Plaintiff read and relied on these statements prior to making its alleged purchases of GSE bonds from Stifel. Plaintiff asserts that "as a result of these false statements," Stifel "sold securities at supra competitive prices . . . and made no effort to use their advertised skill and experience to vet these transactions." (*Id.* ¶ 292.) But the statements do not even refer to GSE bonds, and in any event the SAC contains none of the required particular factual allegations as to what Stifel failed to do or what securities were sold at what prices. Beyond that, Stifel's purported failure to use its skill to detect allegedly supra-competitive GSE bond prices does not rise to the level of "egregious" conduct actionable under LUTPA. *See Turner* v. *Purina Mills, Inc.*, 989 F.2d 1419, 1422 (5th Cir. 1993); *First Am. Bankcard, Inc.* v. *Smart Bus. Tech., Inc.*, 178 F. Supp. 3d 390, 406 (E.D. La. 2016) (dismissing LUTPA claim where plaintiff failed to "include[] enough details to determine whether the actions alleged are 'immoral, unethical, oppressive, unscrupulous, or substantially injurious' so as to give rise to a LUTPA claim").

-18-

Even if Plaintiff's LUTPA claim were not subject to the heightened Rule 9(b) pleading standard, Plaintiff does not state a claim under a more lenient pleading standard. Indeed, Plaintiff fails to allege any facts supporting the claim that Stifel "sold securities at supra competitive prices to the State of Louisiana and its component units, and made no effort to use [its] advertised skill and experience to vet these transactions." (SAC ¶ 292.) As discussed above, the SAC contains no allegations concerning the extent of Stifel's involvement in GSE bond underwriting during the 2009 through 2016 period; its involvement in secondary market trading during that period; or the prices charged by Stifel in selling any GSE bond to Plaintiff or anyone else. *See Van Hoose* v. *Gravois,* 2011–0976 (La. App. 1 Cir. 7/7/11), 70 So.3d 1017, 1024 ("plaintiffs-appellees have failed to adequately allege injury to competition in this case," and "[t]herefore . . . failed to state a claim for unfair trade practices under the LUTPA"). As with its Sherman Act claim, Plaintiff's failure to allege any underlying facts permeates its LUTPA claim and requires its dismissal.

## III.    PLAINTIFF FAILS TO STATE A CLAIM FOR NEGLIGENCE.

Plaintiff also fails to state a claim for negligence under Louisiana law. To state a claim for negligence, a plaintiff must allege that "(1) the defendant had a duty to conform his conduct to a specific standard (the duty element); (2) the defendant's conduct failed to conform to the appropriate standard (the breach element); (3) the defendant's substandard conduct was a cause in fact of the plaintiff's injuries (the cause-in-fact element); (4) the defendant's substandard conduct was a legal cause of the plaintiff's injuries (the scope of liability or scope of protection element); and (5) the actual damages (the damages element)." *Lemann* v. *Essen Lane Daiquiris, Inc*., 2005-1095, p. 8 (La. 3/10/06); 923 So. 2d 627, 633 (citation omitted). Plaintiff has failed to plead any of the required elements.

*First,* Plaintiff does not allege that Stifel owed it a legally cognizable duty. "A threshold issue [] in any negligence action is whether the defendant owed the plaintiff a duty," which "is a

-19-

legal question for the court to decide." *Meany* v. *Meany*, 94-0251, p. 6 (La. 7/5/94), 639 So. 2d

229, 233.  In determining whether a duty exists, "the inquiry is whether the plaintiff has any law—

statutory, jurisprudential, or arising from general principles of fault—to support his claim."

*Bowman* v. *City of Baton Rouge/Par. of E. Baton Rouge*, 2002-1376, p. 6 (La. App. 1 Cir. 5/9/03),

849 So. 2d 622, 627, *writ denied*, 2003-1579 (La. 10/3/03), 855 So. 2d 315.

Plaintiff claims that Stifel "owed a duty of care to their customers, including the State of

Louisiana" and asserts without any supporting factual allegations that Stifel had a "duty to ensure

that the investments that they offered or brokered were suitable for the State of Louisiana as a

client, and a duty to use reasonable care in recommending investments to the State of Louisiana."

(SAC ¶ 279.)  Although the SAC alleges that "the State of Louisiana entered into contracts to

purchase more than 50 fixed rate FNMA and FHLMC securities based upon the recommendations"

of Stifel and other defendants (*id*. ¶ 280), there is no general duty of care between parties entering

into an arm's-length transaction.  *See Guimmo* v. *Albarado*, 99-286, p. 5 (La. App. 5 Cir. 7/27/99),

739 So. 2d 973, 975 (dealings with financial institutions are "generally considered to be arm's

length transactions which do not impose any independent duty of care") (citation omitted).

Plaintiff fails to allege factually any contractual arrangement or other source of any duty that would

vary that general principle and provide the basis for a negligence claim here.

Louisiana law also "clearly foreclose[s]" any argument that Stifel owed an implied duty to

Plaintiff.  *See Grodner & Assocs., APLLC* v. *Regions Bank*, 338 F. Supp. 3d 488, 502 (M.D. La.

2018) (Dick, J.), *aff'd*, 766 F. App'x 12 (5th Cir. 2019) (any assertion by the plaintiff that the

defendant owed "it numerous duties outside those clearly set forth in" the parties' agreement

"clearly foreclosed by Louisiana law") (citing La. R.S. 6:1124).  La. R.S. 6:1124 provides that a

financial institution like Stifel does not have a fiduciary duty to a customer absent a written

agreement in which Stifel specifically agreed "to act and perform in the capacity of a fiduciary." La. R.S. 6:1124 ("No financial institution or officer or employee thereof shall be deemed or implied to be acting as a fiduciary, or have a fiduciary obligation or responsibility to its customers or to third parties other than shareholders of the institution, unless there is a written agency or trust agreement under which the financial institution specifically agrees to act and perform in the capacity of a fiduciary."). Plaintiff does not identify or plead any such agreement.

Because Plaintiff does not plead any law, statute, or contractual provision supporting any claimed duty, its negligence claim fails and should be dismissed.

*Second,* even if Plaintiff had sufficiently pled a cognizable duty (and it has not), Plaintiff fails to plead any facts sufficient to show that any such duty was breached. It alleges nothing about its dealings with Stifel other than that Stifel sold it GSE bonds. Plaintiff does not adequately allege that Stifel was part of a conspiracy or that Stifel knew about the alleged conspiracy, and alleges no specifics about what GSE bonds were sold to Plaintiff by Stifel and at what prices, only the total amount of bonds purchased from or sold to Stifel between July 2010 and June 2013. (SAC ¶ 267.) Plaintiff's bald assertion that Stifel knew or should have known that the bonds it sold to Plaintiff "were the subject of a fraud or scam; i.e., the unlawful price fixing scheme of the remaining 'chat room' defendants" (SAC ¶ 286), has no factual support in the SAC and cannot itself serve as the basis for a claim of breach of duty.[11]

---

[11]    To the extent that Plaintiff attempts to argue that the fact that Stifel is regulated by FINRA means that it owes a fiduciary duty to Plaintiff, it does not allege this anywhere in the SAC. Moreover, Plaintiff "'cannot recover for negligence based on the alleged violation of a FINRA rule.'" *Mraz* v. *JPMorgan Chase Bank, N.A.*, 2018 WL 2075427, at *5 n.4 (E.D.N.Y. May 3, 2018) (citation omitted); *Fox* v. *Lifemark Sec. Corp.*, 84 F. Supp. 3d 239, 245 (W.D.N.Y. 2015) (holding that "FINRA does not provide a private right of action, thus even if defendants violated FINRA rules, plaintiff cannot recover for negligence").

## CONCLUSION

After several opportunities to amend its complaint, Plaintiff does not come close to pleading a claim against Stifel.  Accordingly, for the reasons set forth above, Stifel respectfully requests that the Court dismiss the SAC as to Stifel with prejudice.


*/s/ George. C. Freeman, III*
George C. Freeman, III (LA Bar No. 14272)
Robert J. Dressel (LA Bar No. 35757)
Chloé M. Chetta (LA Bar No. 37070)
BARRASSO USDIN KUPPERMAN
  FREEMAN & SARVER, L.L.C.
909 Poydras Street, Suite 2350
New Orleans, Louisiana 70112
Telephone: (504) 589-9700
Facsimile: (504) 589-9701
gfreeman@barrassousdin.com
rdressel@barrassousdin.com
cchetta@barrassousdin.com

Robert A. Sacks (*admitted pro hac vice*)
SULLIVAN & CROMWELL L.L.P.
1888 Century Park East
Los Angeles, CA 90067-1725
Telephone: (310) 712-6600
Facsimile:  (310) 712-8800
sacksr@sullcrom.com

***Attorneys for Stifel, Nicolaus & Co., Inc.***


## CERTIFICATE OF SERVICE

I certify that on July 27, 2020, I served the foregoing on all counsel of record by filing the pleading with the court's electronic court filing (ECF) system, which automatically notifies all counsel.  In addition, I served the following parties, which have not yet enrolled counsel, through their registered agents for service of process via certified mail, as identified on the Secretary of State's website:

BNP Paribas Securities Corp.
c/o The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

Goldman Sachs & Co. LLC
c/o The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801


*/s/   George C. Freeman*