# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF LOUISIANA

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*    \*

|  |  |
|---|---|
| | \* |
| STATE OF LOUISIANA, | \* |
| By and through its Attorney General, | \* CIVIL ACTION |
| JEFF LANDRY, | \* |
| | \* NO. 3:19-cv-00638-SDD-SDJ |
| Plaintiff, | \* |
| | \* JUDGE SHELLY D. DICK |
| v. | \* |
| | \* MAGISTRATE JUDGE SCOTT D. |
| BANK OF AMERICA, N.A., et al., | \* JOHNSON |
| | \* |
| Defendants. | \* |
| | \* |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*    \*


## MEMORANDUM OF LAW IN SUPPORT OF
## JEFFERIES GROUP LLC'S MOTION TO DISMISS THE
## <u>SECOND AMENDED COMPLAINT FOR DAMAGES</u>

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................ 1

BACKGROUND ..................................................................................................... 4

    A.    Plaintiff's Sherman Act Claim .................................................... 5

    B.    Plaintiff's LUTPA Claim .......................................................... 8

    C.    Plaintiff's Negligence Claim ..................................................... 8

ARGUMENT .......................................................................................................... 9

    I.    PLAINTIFF FAILS TO ALLEGE A SHERMAN ACT VIOLATION BY
           JEFFERIES ........................................................................................... 9

           A.    The SAC Pleads No Facts Indicating That Jefferies Participated in
                 Any Allegedly Unlawful Agreement Concerning Post-Syndication
                 Pricing ..................................................................................... 11

           B.    No Circumstantial Evidence of FTT Price-Fixing by Jefferies ............. 14

    II.    PLAINTIFF'S LUTPA CLAIM SHOULD BE DISMISSED ............................ 17

    III.    PLAINTIFF'S NEGLIGENCE CLAIM SHOULD BE DISMISSED ................ 21

           A.    Plaintiff Has Failed to Establish That Jefferies Owed Louisiana
                 Any Legally Cognizable Duty ..................................................... 22

           B.    The SAC Contains No Allegations Sufficient to Show That
                 Jefferies Breached Any Alleged Duty .......................................... 24

CONCLUSION ....................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Abraham & Veneklasen Joint Venture v. Am. Quarter House Ass'n*,
    776 F.3d 321 (5th Cir. 2015) ..................................................................10

*Adams v. Pilgrim's Pride Corp.*,
    182 F. Supp. 3d 679 (E.D. Tex. 2016)....................................................20

*Alaska Elec. Pension Fund v. Bank of Am. Corp.*,
    175 F. Supp. 3d 44 (S.D.N.Y. 2016).......................................................14

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007).................................................................................11

*Bluebonnet Hotel Ventures, L.L.C. v. Wachovia Bank, N.A.*,
    No. CV 10-489-JJB-DLD, 2011 WL 13074300 (M.D. La. Sept. 29, 2011) ..........................24

*Bobby & Ray Williams P'ship v. The Shreveport La. Hayride Co.*,
    38, 224 (La. App. 2 Cir. 4/21/04), 873 So. 2d 739 ................................20

*Bolanos v. Madary*,
    609 So. 2d 972 (La. App. 1992), *writ denied*, 615 So. 2d 339 (La. 1993) ..............................20

*Brand Coupon Network, LLC v. Catalina Mktg. Corp.*,
    No. 11-CV-00556 (BAJ), 2014 WL 6674034 (M.D. La. Nov. 24, 2014) ..............................19

*Caldwell Wholesale Co. v. RJ Reynolds Tobacco Co.*,
    781 F. App'x 289 (5th Cir. 2019) ...........................................................19

*Chemtreat, Inc. v. Andel*,
    No. Civ. A. 03-1917, 2003 WL 22466235 (E.D. La. Oct. 29, 2003) .....................20

*Concord Assocs., L.P. v. Entm't Props. Tr.*,
    No. 12 CIV. 1667 (ER), 2014 WL 1396524 (S.D.N.Y. Apr. 9, 2014),
    *aff'd*, 817 F.3d 46 (2d Cir. 2016) ............................................................1

*Corr Wireless Commc'ns, L.L.C. v. AT & T, Inc.*,
    893 F. Supp. 2d 789 (N.D. Miss. 2012)...................................................9

*D & J Tire, Inc. v. Bank One, La., Nat'l Ass'n*,
    2002-0935 (La. App. 3 Cir. 2/5/03), 838 So. 2d 112...............................23

*De Kwiatkowski v. Bear, Stearns & Co.*,
    306 F.3d 1293 (2d Cir. 2002)..................................................................22

*Faucheaux v. Terrebonne Consol. Gov't*,
    615 So. 2d 289 (La. 1993) ......................................................................13

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Golden Bridge Tech., Inc. v. Motorola, Inc.*,
   547 F.3d 266 (5th Cir. 2008) ......................................................................9, 10, 12

*Grodner & Assocs., APLLC v. Regions Bank*,
   338 F. Supp. 3d 488 (M.D. La. 2018) ..................................................................23

*Guimmo v. Albarado*,
   99-286 (La. App. 5 Cir. 7/27/99), 739 So. 2d 973 ...............................................22

*In re Aluminum Warehousing Antitrust Litig.*,
   No. 13-md-2481 (KBF), 2014 WL 4277510 (S.D.N.Y. Aug. 29, 2014) ................16

*In re Aluminum Warehousing Antitrust Litig.*,
   No. 13-md-2481 (KBF), 2015 WL 1344429 (S.D.N.Y. Mar. 23, 2015) ..................1

*In re Beef Indus. Antitrust Litig.*,
   907 F.2d 510 (5th Cir. 1990) ...............................................................................15

*In re Blood Reagents Antitrust Litig.*,
   266 F. Supp. 3d 750 (E.D. Pa. 2017) .....................................................................9

*In re Commodity Exch., Inc., Gold Futures & Options Trading Litig.*,
   328 F. Supp. 3d 217 (S.D.N.Y. 2018) ...................................................................16

*In re Currency Conversion Fee Antitrust Litig.*,
   773 F. Supp. 2d 351 (S.D.N.Y. 2011) ...................................................................15

*In re European Bonds Antitrust Litig.*,
   No. 19 Civ. 2601, Dkt. 115 (S.D.N.Y. July 23, 2020) ..........................................17

*In re GSE Bonds Antitrust Litig.*,
   396 F. Supp. 3d 354 (S.D.N.Y. 2019).............................................................. *passim*

*In re High Fructose Corn Syrup Antitrust Litig.*,
   295 F.3d 651 (7th Cir. 2002) .................................................................................9

*In re Interest Rate Swaps Antitrust Litig.*,
   261 F. Supp. 3d 430 (S.D.N.Y. 2017) ...................................................................15

*In re Pool Prods. Distrib. Mkt. Antitrust Litig.*,
   158 F. Supp. 3d 544 (E.D. La. 2016) ....................................................................13

*Indep. Order of Foresters v. Donald, Lufkin & Jenrette, Inc.*,
   157 F.3d 933 (2d Cir. 1998) .................................................................................22

*Jeanes v. McBride*,
   No. 16-CV-1259, 2019 WL 2387863 (W.D. La. June 4, 2019) ............................19

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Lemann v. Essen Lane Daiquiris, Inc.*,
   2005-1095 (La. 3/10/06), 923 So. 2d 627 ...........................................................21

*Mariche v. Wells Fargo Bank, N.A.*,
   No. 11-CV-1191, 2012 WL 1057626 (E.D. La. Mar. 28, 2012) ............................18

*Marucci Sports, LLC v. NCAA*,
   751 F.3d 368 (5th Cir. 2014) ..............................................................................13

*Martinez Tapia v. Chase Manhattan Bank, N.A.*,
   149 F.3d 404 (5th Cir. 1998) ..............................................................................22

*Mayor & City Council of Balt., Md. v. Citigroup, Inc.*,
   709 F.3d 129 (2d Cir. 2013)........................................................................10, 15, 16

*Meany v. Meany*,
   94-0251 (La. 7/5/94), 639 So. 2d 229 .................................................................22

*Michael Clayton Enters. LLC v. Hossley*,
   No. 13-00537-BAJ-RLB, 2014 WL 4699495 (M.D. La. Sept. 19, 2014) .............14

*NOLA 180 v. Treasure Chest Casino, LLC*,
   11-853 (La. App. 5 Cir. 3/27/12), 91 So. 3d 446 ............................................20, 21

*Quality Envtl. Processes, Inc. v. I.P. Petroleum Co.*,
   144 So. 3d 1011 (La. 2014) .................................................................................19

*Rios v. City of Del Rio, Tex.*,
   444 F.3d 417 (5th Cir. 2006) ..............................................................................11

*Satterfeal v. LoanCare, LLC*,
   No. 3:18-1021-JWD-EWD, 2019 WL 5777379 (M.D. La. Nov. 5, 2019)............23

*Schafer v. State Farm Fire & Cas. Co.*,
   507 F. Supp. 2d 587 (E.D. La. 2007) ..................................................................10

*Truong v. Bank of Am., N.A.*,
   717 F.3d 377 (5th Cir. 2013) ..............................................................................18

*Tunica Web Advert. v. Tunica Casino Operators Ass'n, Inc.*,
   496 F.3d 403 (5th Cir. 2007) ..............................................................................10

*Westside–Marrero Jeep Eagle, Inc. v. Chrysler Corp., Inc.*,
   56 F. Supp. 2d 694 (E.D. La. 1999)....................................................................23

*Whitfield v. Countrywide Home Loans, Inc.*,
   252 F. App'x 654 (5th Cir. 2007) ........................................................................23

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Wilson v. Binberg*,
    569 Fed. Appx. 343 (5th Cir. 2014)........................................................................6

**Statutes**

15 U.S.C. § 1 ...................................................................................... *passim*

La. Stat. Ann. § 6:1124 ...................................................................................23

La. Stat. Ann. § 51:1405(A) ...........................................................................19

La. Stat. Ann. § 51:1406(1) ............................................................................18

La. Stat. Ann. § 51:1409(A) ...........................................................................20

**Other Authorities**

Fed. R. Civ. P. 10(c) .........................................................................................7

Fed. R. Civ. P. 12(b)(6).................................................................................1, 6

Defendant Jefferies Group LLC ("Jefferies") respectfully submits this memorandum of law in support of its motion under Rule 12(b)(6) of the Federal Rules of Civil Procedure to dismiss the claims against it in the Second Amended Complaint for Damages (Dkt. 130) (the "SAC") filed by Plaintiff State of Louisiana.[1]

## PRELIMINARY STATEMENT

Plaintiff brings this antitrust action against 26 defendants, including Jefferies,[2] alleging a sprawling antitrust conspiracy among them with respect to thousands of different bonds issued by four government sponsored entities ("GSEs") priced and distributed by separate selling syndicates over a seven-year period. Plaintiff also asserts state law claims for negligence and

---

[1] This is one of three substantially similar actions relating to bonds issued by government sponsored entities brought by the same plaintiffs' counsel on behalf of Louisiana governmental entities. Two actions are pending in this district and one in the Eastern District of Louisiana. In *Louisiana Asset Management Pool v. Bank of America Corporation*, 20-cv-2095-GGG-DMD (E.D. La.) ("*LAMP*"), an action pending before U.S. District Judge Greg Gerard Guidry, Jefferies moved to dismiss the complaint. *Id*., Dkt. 84. After missing their deadline to respond to that motion—as they did here—plaintiff's counsel in the *LAMP* case did exactly what they have now done twice in this case: amend their complaint in an attempt to remedy pleading failures established by Jefferies's motion. *Id*., Dkt. 116. A motion to transfer the *LAMP* case to this Court also is pending before Judge Guidry. *Id*., Dkt. 81.

The same plaintiff's counsel also filed a separate and nearly identical action in this Court titled *City of Baton Rouge v Bank of America Corporation*, 19-cv-00725-SDD-RLB, in which it has repeatedly missed deadlines and pursued the same serial amendment strategy. Jefferies is not a defendant in that case. Motions to dismiss are pending in the *Baton Rouge* case. (*Id*., Dkts. 151, 155, 156, and 189).

[2] Plaintiff's claims against Jefferies also fail because the only Jefferies entity named as a defendant, Jefferies Group LLC, is the non-operating corporate parent of Jefferies LLC, the broker-dealer involved in syndicating and trading GSE Bonds. *See* Jefferies Group LLC Form 10-K, at p. 3 (Jan. 29, 2020), *available at* https://www.sec.gov/ix?doc=/Archives/edgar/data/1084580/ 000108458020000004 /jef10k113019.htm. Plaintiff does not plead facts sufficient to allege that Jefferies Group LLC, the parent, itself engaged in the trading at issue or that it dominated and controlled its broker-dealer subsidiary so as to justify piercing the corporate veil for purposes of antitrust liability. *See In re Aluminum Warehousing Antitrust Litig.*, No. 13-md-2481 (KBF), 2015 WL 1344429, at *3 (S.D.N.Y. Mar. 23, 2015) (claims against a parent company "are plausible only if there are factual allegations that specifically pertain to them—as distinct from those applicable to their corporate affiliates—that are sufficient to state a claim as to them individually"); *Concord Assocs., L.P. v. Entm't Props. Tr.*, No. 12 CIV. 1667 (ER), 2014 WL 1396524, at *26 (S.D.N.Y. Apr. 9, 2014) (mere corporate relationship, even where the complaint alleges interlocking directors or officers, not sufficient to bind a parent corporation for the actions of its subsidiary absent veil-piercing allegations), *aff'd*, 817 F.3d 46 (2d Cir. 2016). The claim against Jefferies Group LLC should be dismissed for this reason alone.

under the Louisiana Unfair Trade Practices and Consumer Protection Act ("LUTPA"). Defendants were authorized dealers of GSE bonds that, acting in syndicate sub-groups, that varied for each bond, bought the bonds from the GSE issuers, and distributed them to investors. Particularly significant to the claims against Jefferies, Plaintiff concedes that communications among defendants, including Jefferies, ***during*** the joint syndication process were perfectly lawful—and, in fact, necessary to achieve the GSEs' objectives. Plaintiff's claims are instead based on communications in which some defendants in some syndicates allegedly reached agreements on the initial, ***post-syndication*** price—known as the "free-to-trade" or "FTT" price.

Plaintiff's allegation that Jefferies participated in the alleged conspiracy relies primarily on a quote from a single chat about a single GSE bond. SAC ¶ 184. On its face, however, that one chat occurred during the syndication process, concerned in-syndication pricing, and does not reflect any agreement on the FTT price. *Id*.

Jefferies's name (misspelled in the SAC as "Jeffries") also appears in two tables of alleged transactions between Plaintiff and certain Defendants. The first table refers to the purported sale of an unspecified "GSE Bond" from Jefferies to Plaintiff at an allegedly inflated price, but Plaintiff does not claim that Jefferies was a member of the syndicate for the referenced GSE bond or that Jefferies participated in any communications with respect to the pricing of that bond from which an unlawful agreement could be inferred. SAC ¶ 267. The second table in the SAC lists Jefferies but does not reference any transactions. And, in all events, the SAC does not plead any facts that, if proven, would establish that these alleged transactions were affected in any way by Jefferies' alleged communications with other defendants. Nor does the SAC plead facts plausibly showing that those transactions were affected by an agreement between Jefferies and another defendant with respect to FTT pricing.

The paucity of allegations against Jefferies is not surprising because the SAC copies almost *verbatim* the complaint in *In re GSE Bonds Antitrust Litigation*, Case No. 19-cv-1704, Dkt. 254 (S.D.N.Y. Sept. 10, 2019) ("*In re GSE Bonds*"), a now-resolved class action in the United States District Court for the Southern District of New York in which **Jefferies was not named as a defendant**.[3]

The antitrust claim fails for other reasons.  Plaintiff's statistical analyses (also copied *verbatim* from the *In re GSE Bonds* complaint) are merely averages across all GSE bond transactions and say nothing about whether any particular defendant participated in any alleged conspiracy, or that any particular investor—much less this plaintiff—paid too much for any particular bond.  In *In re GSE Bonds*, the court specifically found that the same analyses cited by Plaintiff here were insufficient to state a claim against defendants that, like Jefferies in this case, were not alleged to have engaged in chatroom communications about post-syndication pricing. 396 F. Supp. 3d 354, 365 (S.D.N.Y. 2019).  Plaintiff also makes no attempt to plead facts suggesting that Jefferies engaged in any allegedly parallel conduct from which participation in the alleged conspiracy could be inferred.  Even if it did, the claims would still fail because Plaintiff does not plead the "plus factors" necessary to create any such plausible inference.

Plaintiff's claim under LUTPA is also legally deficient.  Plaintiff alleges that Jefferies stated on its website that it had "experience and skill in recommending investments" (SAC ¶ 291) and those statements were allegedly deceptive because Jefferies failed to detect purportedly supra-competitive prices in the market for GSE bonds.  First, the claim is barred by LUTPA's exemption for claims against affiliates of licensees of the Louisiana Office of Financial

---

[3]  Jefferies was included as a defendant in only one of about a dozen actions filed in the Southern District of New York that were ultimately consolidated under the caption *In re GSE Bonds Antitrust Litigation*. In the Consolidated Amended Class Action Complaint, however, Jefferies was dropped from the case.  *In re GSE Bonds*, Dkt. 171.

Institutions, such as Jefferies. Second, Plaintiff does not, and cannot, allege that any of the alleged statements by Jefferies about its experience in investment products and services were unfair or deceptive in any way. Third, Plaintiff does not that allege that Jefferies acted with the specific intent of harming competition. Fourth, Plaintiff does not allege facts demonstrating it suffered any "ascertainable loss" caused "as a result" of the conduct allegedly violating LUTPA. Fifth, even if this claim were adequately pleaded—and it is not—the provision of LUTPA under which the Attorney General sues does not permit a claim for damages on behalf of the State.

Plaintiff's negligence claim likewise fails. Plaintiff does not, and cannot, plead that Jefferies owed Plaintiff any legally cognizable duty of care—an essential element of a negligence claim. Plaintiff and Jefferies, both highly sophisticated entities, were allegedly counterparties to GSE bond trades. As an arm's length counterparty, Jefferies owed no fiduciary or other duties to Plaintiff, and the SAC pleads no facts from which any duty may be inferred. Nor has Plaintiff proffered any facts giving rise to a plausible inference that Jefferies knew of or should have known about the alleged conspiracy supposedly reflected in the chats in which Jefferies is not alleged to have participated.

## BACKGROUND

On September 23, 2019, Plaintiff filed its initial Complaint (Dkt. 1). Jefferies moved to dismiss the Complaint. Dkt. 17. On December 3, 2019, Plaintiff filed its First Amended Complaint, thereby mooting the motion to dismiss. Once again, on January 7, 2020, Jefferies and two other defendants moved to dismiss the First Amended Complaint. Dkt. 69. After the deadline to file its opposition to the motion to dismiss had passed, Plaintiff again sought leave to amend to file a Second Amended Complaint (Dkt. 88). On July 13, 2020, the Court granted Plaintiff's motion and the SAC was docketed the same day. Like the initial Complaint and the

First Amended Complaint, the SAC copies almost *verbatim* the complaint filed in *In re GSE Bonds*, a recently-settled class action in which Jefferies was not a defendant.

### A.    Plaintiff's Sherman Act Claim

Plaintiff alleges one category of what it claims is "direct evidence" of a conspiracy: chatroom communications in which traders at different institutions allegedly agreed on post-syndication FTT pricing in the secondary market.  SAC ¶ 184.  Plaintiff's claim against Jefferies rests on a single "chat" between a trader at Jefferies and traders at two other financial institutions.  Plaintiff concedes that, before GSE bonds are free-to-trade, or "FTT," such institutions are legally permitted to work in syndicates and attempt to place the bonds with buyers in the primary market, typically a regional bank that will hold the bonds as an investment.  SAC ¶ 130; *In re GSE Bonds*, 396 F. Supp. 3d at 357.  Crucially, as even Plaintiff acknowledges, institutions are permitted to communicate with each other during this phase, and frequently do so through multi-bank chatrooms.  *Id.*; *see* SAC ¶ 14 (alleging that "[a]s a result, traders involved in GSE Bond syndicates of the Defendants ***were allowed to participate in multi-bank chat rooms to discuss pricing***.") (emphasis in original).

The single chat involving Jefferies took place on May 5, 2015, ***during*** the syndication period for the GSE bond being discussed, when Plaintiff concedes the traders were allowed to communicate about syndication pricing.  The portion of the chat Plaintiff quotes reads:

> Jefferies Trader:
>
> Spread off my marks but fixed
>
> Wells Fargo Trader:
>
> So how r we showing now, and r we growing?
>
> FTN Financial Trader:
>
> I'm fine adjusting the concession w/the market move but we have a decent amount of bonds (in aggregate) so i don't see a pressing need to upsize

<u>Jefferies Trader</u>:

ok, less .50c?

<u>Jefferies Trader</u>:

Or ftt 99.95?

<u>Jefferies Trader</u>:

Whatever works here

<u>Morgan Stanley Trader</u>:

-35c?

<u>Jefferies Trader</u>:

You guys have the most so I'll do whatever

<u>Wells Fargo Trader</u>:

i was thinking 100-0.40

<u>Wells Fargo Trader</u>:

nmag is 99.90 on the freddie 2.00's

<u>FTN Financial Trader</u>:

nice middle ground [. . .] lets go less $.40

<u>Morgan Stanley Trader</u>:

40c works

<u>Morgan Stanley Trader</u>:

also - sounds like [. . .] is pretty hell bent on $ averaging in, and can keep the -40c. i dont mind topping off with 10mm more, and putting back on top of nim2 but i'll go with group - will let you guys decide w him

<u>Jefferies Trader</u>:

Done

SAC ¶ 184.  On its face, nothing in this chat excerpt reflects an agreement to go FTT at a particular price, or go FTT at all.  To the contrary, as detailed in the Argument section below, the full chat transcript (Exs. 1-2),[4] which Plaintiff appears to have deliberately omitted, further

---

[4] "Ex. _" refers to the accompanying Declaration of Kenneth I. Schacter, dated July 27, 2020.  The Court may consider the full transcript of the chat excerpted in the SAC.  *Wilson v. Binberg*, 569 Fed. Appx. 343, 344 n.1 (5th Cir. 2014) (noting that the court may consider the full text of a letter at the Rule 12(b)(6)

confirms that the GSE bond at issue remained in syndication until the day *after* the quoted chat and never went FTT at any agreed-upon price. Moreover, Plaintiff does not allege it ever purchased the bond that was the subject of this chat from Jefferies, or anyone else.

Plaintiff also attempts to tie Jefferies to the alleged conspiracy to fix FTT prices using supposed circumstantial "evidence." The SAC sets forth three types of "economic analyses [that] show pricing patterns consistent with an agreement among Defendants to charge supra-competitive prices for GSE Bonds." SAC ¶¶ 9-12. None of these "economic analyses" even mentions Jefferies (unsurprisingly, because they are lifted from the complaint in *In re GSE Bonds*, in which Jefferies was not a defendant). Nor is Jefferies identified in the SAC's "TABLE 1: Share of GSE Bond Underwriting from January 1, 2009 through January 1, 2016," which lists defendants whose "Average Market Share During Time period between 2009 and 2016" ranged from 0.13% to 14.07%. SAC ¶ 136.

The SAC also alleges the following additional circumstantial "evidence": (1) dealers' ability to work together in syndicates to place newly issued GSE bonds in the primary market, and then compete as dealers of the same Bonds in the secondary market, "foster[s] collusion" (SAC ¶¶ 188-208); (2) some defendants (but not Jefferies) were allegedly involved in other conspiracies involving other financial products (SAC ¶¶ 257-63); and (3) the Department of Justice is investigating the practices of another defendant and other unidentified dealers regarding GSE bonds (SAC ¶ 187). As with the economic analysis, none of these allegations even mentions Jefferies.

---

stage because the letter was partially quoted in the pleadings); *see* Fed. R. Civ. P. 10(c) (adopting documents attached to pleading as part of the pleading for all purposes).

### B.    Plaintiff's LUTPA Claim

Plaintiff supports its LUTPA claim with a mere seven paragraphs in the SAC, which lumps all defendants together.  SAC ¶¶ 289-95.  The conclusory LUTPA allegations assert that (1) "each of these defendants engaged in deceptive business practices regarding the use of their brokerage services, including making false statements or omissions regarding the price of their securities and their use of their experience and skill in recommending investments" (SAC ¶ 291), and (2) "[t]his combination of inducing clients to use their services and using advertising mediums to tout their skill and experience is a deceptive practice, in that these defendants undertook no effort at all to ascertain the suitability of their offered services, and took no actions to ascertain the reason for the supra-competitive prices the Plaintiff ultimately paid for the investments brokered by them." SAC ¶ 294.  Plaintiff claims to have suffered harm because defendants allegedly "sold securities at supra competitive prices to the State of Louisiana, and made no effort to use their advertised skill and experience to vet these transactions."  SAC ¶ 292. None of these allegations mentions Jefferies, much less any representations made by Jefferies.

### C.    Plaintiff's Negligence Claim

Plaintiff alleges that Jefferies is liable for negligence with respect to $40,000,000 in "fixed rate securities" purchased between July 1, 2010 and June 30, 2011 that "were inflated in price as a result of the conspiracy of the 'chat room' defendants as outlined in this complaint." SAC ¶ 276.  The SAC alleges in conclusory fashion that Jefferies owed Plaintiff a "duty to ensure that the investments that they offered or brokered were suitable for the State of Louisiana as a client, and a duty to use reasonable care in recommending investments to the State of Louisiana."  SAC ¶ 279.  The supposed duty of care includes "a duty to avoid unreasonable behavior which puts a client at risk of financial harm and a duty to avoid recommending investments which it knew or should have known would constitute a fraud or a scam."  SAC ¶

279.  Plaintiff does not allege that it was ever a Jefferies customer, or that Jefferies ever "recommend[ed] the purchase" of any bonds.  The only two representations attributed to Jefferies are generic statements on its website that do not mention Plaintiff or GSE bonds.  SAC ¶ 282.  Plaintiff alleges that it "relied upon statements such as these … when it awarded contracts to sell securities to the State of Louisiana."  SAC ¶ 285.

Plaintiff further alleges, without any basis, that "each of the Defendants in the use of their 'skill and experience' knew or should have known that the bid-ask spreads were artificially widened between 2009 and 2016"; that prices were artificially higher for newly issued GSE bonds; and that prices for such new issues "increased in the days before each new issuance, indicating … that the prices were being subjected to artificial price fixing."  SAC ¶ 287.

## ARGUMENT

## I.    PLAINTIFF FAILS TO ALLEGE A SHERMAN ACT VIOLATION BY JEFFERIES

To allege a claim for violation of Section 1 of the Sherman Act, a plaintiff must plead direct evidence or circumstantial evidence of concerted action to fix prices.  To qualify as "direct evidence," a communication must reflect an "***explicit understanding*** between the [defendants] to collude."  *Golden Bridge Tech., Inc. v. Motorola, Inc.*, 547 F.3d 266, 272 (5th Cir. 2008) (emphasis added).  Such evidence must be "explicit and require no inferences to establish the proposition or conclusion being asserted."  *Corr Wireless Commc'ns, L.L.C. v. AT & T, Inc.*, 893 F. Supp. 2d 789, 805 (N.D. Miss. 2012).  In other words, such evidence must be "tantamount to an acknowledgment of guilt."  *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 662 (7th Cir. 2002).[5]

---

[5]  *Compare Golden Bridge Tech.*, 547 F.3d at 272 (email communications reflecting "common dislike" for competitor are not direct evidence of group boycott); *In re Blood Reagents Antitrust Litig.*, 266 F. Supp. 3d 750, 779-80, 783 (E.D. Pa. 2017) (language that competitor was "counting on us to follow and

An antitrust complaint relying on circumstantial evidence must plead facts showing both: (1) parallel conduct by the alleged conspirators, and (2) "plus factors" that support an inference of concerted action. *Schafer v. State Farm Fire & Cas. Co.*, 507 F. Supp. 2d 587, 596 (E.D. La. 2007). "Independent parallel conduct, or even conduct among competitors that is consciously parallel, does not alone establish the contract, combination, or conspiracy required by § 1 [of the Sherman Act]." *Golden Bridge Tech.*, 547 F.3d at 271. To the extent any "plus factors" support an inference of concerted actions, such factors must be weighed against competing inferences of independent action.

The Fifth Circuit has long held that a plaintiff can prevail on a conspiracy claim based on parallel conduct only when the evidence (1) "tend[s] to exclude the possibility that the [defendants] acted independently," and (2) "show[s] that the inference of conspiracy is reasonable in light of the competing inferences of independent action or collusive action that could not have harmed [plaintiff]." *Id.* at 270-71 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 575 (1986)); *Abraham & Veneklasen Joint Venture v. Am. Quarter House Ass'n*, 776 F.3d 321, 330 (5th Cir. 2015) ("Ultimately, any conduct that is 'as consistent with permissible competition as with illegal conspiracy' cannot support a conspiracy inference." (quoting *Matsushita*, 475 U.S. at 588)).

In *Bell Atlantic Corp. v. Twombly*, the Supreme Court extended this principle to the pleading stage by holding that when allegations of parallel conduct are made, "they must be

---

make their job easier," as well as "[r]eferences to averting price wars," a "truce," and "upset[ting] the apple cart" were "not evidence of collusion"), *with Tunica Web Advert. v. Tunica Casino Operators Ass'n, Inc.*, 496 F.3d 403, 410 (5th Cir. 2007) ("statements and emails" showing defendants "had entered into a 'gentlemen's agreement' to not deal with" competitor are direct evidence of conspiracy); *Mayor & City Council of Balt., Md. v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013) ("recorded phone call in which two competitors agreed to fix prices at a certain level" is direct evidence of conspiracy).

placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." 550 U.S. 544, 557 (2007).

The SAC fails to allege a plausible Sherman Act claim against Jefferies. The only alleged "direct evidence" that even remotely concerns Jefferies is one line of the partial transcript of a May 5, 2015 chat involving an unnamed "Jefferies Trader." SAC ¶ 184. As set forth below, this chat does not constitute "[d]irect evidence" that Jefferies "conspired to fix the price at which GSE Bonds were FTT in the secondary market at supra-competitive levels." SAC ¶ 18. Plaintiff also alleges that circumstantial evidence supports an inference of collusion, but none of its allegations mentions Jefferies. SAC ¶¶ 188-208. The Sherman Act claim therefore fails. *Rios v. City of Del Rio, Tex.*, 444 F.3d 417, 420-21 (5th Cir. 2006) ("Dismissal is proper if the complaint lacks an allegation regarding a required element necessary to obtain relief.").

### A. The SAC Pleads No Facts Indicating That Jefferies Participated in Any Allegedly Unlawful Agreement Concerning Post-Syndication Pricing

As Plaintiff acknowledges, GSE bonds are marketed in two distinct stages: (i) the syndication phase, when the bonds are issued and priced by approved GSE bond dealers that are lawfully acting in concert; and (ii) the subsequent secondary market, when all dealers are free to trade the bonds at whatever prices they choose. SAC ¶¶ 130-131. In syndication, approved GSE bond dealers work together to jointly submit proposals to GSEs reflecting their "plan for underwriting and bringing a new bond to market." SAC ¶ 129. That plan includes details like "the size of the offering and how it will be allocated among the Approved GSE Bond Dealers should they be selected." *Id.* If selected by the GSE, those syndicate members "work together in 'the primary market' to try and place the new GSE Bonds with a bulk buyer." SAC ¶ 130. The dealers may "upsize" their position by purchasing additional bonds from the GSE issuer. *See, e.g.*, SAC ¶ 176. Importantly, Plaintiff concedes that, during syndication, ***"GSE Bond Dealers***

11

***are permitted to communicate with each other to effectuate the initial placement in the
primary market."*** SAC ¶ 130 (emphasis added).

     The syndication period ends when the dealers collectively "declare the new issuance
'free-to-trade' often abbreviated as 'FTT.'" SAC ¶ 131. Only after "this announcement occurs,
secondary market trading begins, and the Approved GSE Bond Dealers that made up the
syndicate are supposed to compete against one another to sell the newly issued GSE Bonds to
investors." *Id.* To be clear, Plaintiff's Sherman Act claim is based solely on allegedly improper
communications by certain defendants regarding FTT pricing, ***not*** syndication pricing or terms .
*See, e.g.*, SAC ¶ 5 ("Defendants inflated the prices of newly issued GSE Bonds acquired through
the GSE Issuance Process throughout the time period between 2009 and 2016 by fixing the price
those bonds were [FTT] in the secondary market at artificially higher, anticompetitive levels.
This direct evidence of price fixing has been identified by chat room transcripts which clearly
record agreements to fix FTT prices."); *see also In re GSE Bonds*, 396 F. Supp. 3d 354, 358
(S.D.N.Y. 2019) ("The thrust of plaintiffs' theory is that defendants agreed to keep prices high
for newly issued bonds when they were released to the secondary market.").

     The partial chat transcript involving a Jefferies trader—the one and only allegation in the
SAC involving anyone from Jefferies—whether viewed in isolation or in the context of the full
chat regarding the GSE bond at issue (*see* Exs. 1-2), thoroughly undermines Plaintiff's assertion
that Jefferies and other dealers agreed to fix FTT prices.

     ***First***, the quoted excerpt, on its face, does not demonstrate any "explicit understanding"
to fix FTT prices. *Golden Bridge Tech.*, 547 F.3d at 272. Plaintiff appears to rely entirely on a
passage in which a Jefferies trader asks "ok, less .50c? Or ftt 99.95? Whatever works here."
SAC ¶ 184. Importantly, the question is not followed by any agreement on FTT prices. In fact,

no other trader even responds to the question regarding a potential FTT price level.  To the contrary, the traders ignore the question and continue to discuss pricing *within the syndicate*.

As shown in the next line of the portion of the transcript quoted by Plaintiff, the Firm # 3 trader responds to the Jefferies trader's question by suggesting a *syndication* price—a discount from par value of 100—of "-35c?"  SAC ¶ 184 (Ex. 1, at 14:22:09).  The Firm # 1 trader states, "i was thinking 100-.40" [*i.e.*, -40c]."  *Id.* at 14:23:02.  The Firm # 2 trader says, "nice middle ground" and "lets go less $.40."  *Id.* at 14:23:18.  The Firm # 3 trader, who initially proposed -35c, says "40c works," and the Jefferies trader, who had proposed "less 50c," says "done."  *Id.* at 14:23:23, 14:24:03.  All of this discussion is about *syndication pricing*.

Simply put, the partial chat transcript included in the SAC does not even reflect any agreement to go FTT—let alone go FTT at an agreed-upon price.  *Marucci Sports, LLC v. NCAA*, 751 F.3d 368, 379 (5th Cir. 2014) (complaint must advance "factual information to demonstrate that there was a meeting of the minds between the [defendant] and other alleged coconspirators").  While the Jefferies trader raises the question of whether the syndicate should terminate and suggests a possible FTT price, there is no agreement to go FTT at any particular price, and thus no direct evidence of price-fixing.  *See In re Pool Prods. Distrib. Mkt. Antitrust Litig.*, 158 F. Supp. 3d 544, 551 (E.D. La. 2016) ("direct evidence cannot be ambiguous").[6]

---

[6]  Although Plaintiff presumably has the full chat transcript in its possession, the SAC omits key portions of the chat that further confirm that no agreement on FTT pricing occurred.  Just before the passage quoted in the SAC, the traders discuss upsizing the deal—that is, increasing the amount of bonds the *syndicate* would purchase from the bond issuer.  *See* Ex. 1, at 14:12:42 ("guys 10bps in upsize, [Firm # 4 trader] wants to do, i guess id take 10mm, any one else?").  Following the snippet quoted in the SAC, the traders repeatedly state that the bond is still in syndication.  For example, almost two hours *after* the excerpt quoted in the SAC, the same Jefferies trader asks, "ftt? Seems like the bonds are stacking up cheaper away."  Ex. 1, at 16:51:12-16:51:42.  The Firm # 1 trader responds, "*no it is in syndi*."  *Id.* at 16:51:42.  The *next day*, the Firm # 2 trader asks, "*so, stay in syndicate*? less $.50 ? or ftt. *my vote is synd*."  Ex. 2, at 12:31:13-12:31:25.  The Firm # 3 trader responds, "i'm fine to *stay in synd* at less 0.50."  Ex. 2, at 12:35:26.  Later in the day, the traders finally agree to end the syndication process and have the bond go FTT, *but never discuss any particular price*.  Ex. 2, at 16:42:01, at 16:54:53.

**Second**, Plaintiff does not allege that it purchased the bond at issue in this chat—from Jefferies or anyone else. Indeed, the chat occurred nearly four years **after** the last of Plaintiff's alleged transactions with Jefferies, which, according to Plaintiff, occurred on July 1, 2010 and June 30, 2011. SAC ¶ 267. Thus, even if the May 5, 2015 chat somehow supported Plaintiff's theory that Jefferies participated in FTT price fixing (and it does not), the conspiracy could not plausibly have affected any of Plaintiff's alleged GSE bond transactions with Jefferies years earlier.

**Third**, Plaintiff also fails to allege that any purchaser of the bond discussed on May 5-6, 2015 would have paid a lower FTT price post-syndication but for these alleged discussions, much less that its purchases of different bonds from other defendants were impacted in any way by those in-syndication discussions.

**B.     No Circumstantial Evidence of FTT Price-Fixing by Jefferies**

Plaintiff's circumstantial allegations as to Jefferies are equally deficient. The SAC does not allege the requisite (1) parallel conduct by Jefferies, or (2) "plus factors" that support an inference of concerted action involving Jefferies. Accordingly, Plaintiff fails to state a Sherman Act claim against Jefferies based on circumstantial evidence. *Michael Clayton Enters. LLC v. Hossley*, No. 13-00537-BAJ-RLB, 2014 WL 4699495, at *3 (M.D. La. Sept. 19, 2014) (In determining plausibility, "a court does not assume the truth of conclusory statements, but rather looks for facts which support the elements of the pleader's claim.").

**First**, Plaintiff makes no attempt to plead facts suggesting that Jefferies engaged in parallel conduct, let alone parallel conduct suggesting a conspiracy to fix secondary-market prices of any GSE bonds. To plead parallel conduct, Plaintiff would have to show that each defendant behaved in the same way with respect to the GSE bonds during the alleged conspiracy period. *See, e.g., Alaska Elec. Pension Fund v. Bank of Am. Corp.*, 175 F. Supp. 3d 44, 54

14

(S.D.N.Y. 2016) (alleging multi-year period when each defendant made swap rate submissions reflecting "exact same bid/ask spread" nearly every day); *In re Currency Conversion Fee Antitrust Litig.*, 773 F. Supp. 2d 351, 367-73 (S.D.N.Y. 2011) (alleging multi-year period when each defendant implemented same foreign-currency conversion fee).

The partial transcript of the May 5-6, 2015 chat discussed above does not reflect any sales by Jefferies on the secondary market—let alone sales at similar prices, around the same times—for any GSE bonds sold by other defendants. To the contrary, both the excerpt of the May 5 chat quoted in the SAC and the full May 5-6 chat show that the traders did ***not*** agree on an FTT price. *See In re Beef Indus. Antitrust Litig.*, 907 F.2d 510, 514 (5th Cir. 1990) ("When an antitrust plaintiff relies on circumstantial evidence of conscious parallelism to prove a § 1 claim, he must first demonstrate that the defendants' actions were parallel.").

***Second***, the SAC alleges no "plus factors," *i.e.*, additional facts and circumstances creating a plausible inference that any alleged parallel conduct "flowed from a preceding agreement." *Mayor & City Council of Balt., Md. v. Citigroup, Inc.*, 709 F.3d 129, 137-38 (2d Cir. 2013). "Plus factors" that may support a plausible inference of conspiracy include: "(1) a common motive to conspire; (2) evidence that shows that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators; and (3) evidence of a high level of interfirm communications." *In re Interest Rate Swaps Antitrust Litig.*, 261 F. Supp. 3d 430, 463 (S.D.N.Y. 2017).

Plaintiff asserts that the following constitute "plus factors": (1) "Defendants did not have systems and controls in place to prevent communication among syndicate members after secondary market trading began" (SAC ¶ 191); (2) "employees on GSE Bond desks moved fluidly among positions at the various banks," which "facilitated familiarity" and "allowed them

15

to discuss and agree upon pricing in the secondary market and trust that all the parties would go along with the agreement (SAC ¶ 197); (3) "GSEs monitored Defendants' performance in the secondary market and awarded underwriting privileges based in part on success in the secondary market," which "gave Defendants a motive to conspire to raise and fix prices in the secondary market" (SAC ¶ 202); and (4) "Defendants are a relatively small number of competitors who controlled the supply of GSE Bonds available to investors through their dominant share in the GSE Issuance Process" (SAC ¶ 206).

None of these allegations "lead[s] to an inference of conspiracy" on the part of Jefferies. *Mayor & City Council of Balt.*, 709 F.3d at 137. The "mere opportunity to conspire does not by itself support the inference that an illegal combination actually occurred," much less that a specific defendant participated therein. *In re Aluminum Warehousing Antitrust Litig.*, No. 13-md-2481 (KBF), 2014 WL 4277510, at *33 (S.D.N.Y. Aug. 29, 2014). In fact, the May 5-6 chat *undermines* Plaintiff's antitrust claim because it shows that when they finally decided to go FTT (on May 6), Jefferies and other dealers did *not* agree on the FTT price. Nor does the chat message "meaningfully add to the mix of circumstantial evidence" that constitutes "plus factors" tending to exclude independent action. *In re Commodity Exch., Inc., Gold Futures & Options Trading Litig.*, 328 F. Supp. 3d 217, 228 (S.D.N.Y. 2018). The Jefferies trader's alleged communication with other firms occurred during concededly lawful syndication activity. And the trader's question regarding whether the in-syndicate bond should go FTT (and mentioning a hypothetical price) was never acknowledged, responded to, or accepted. *Id.* at 228 ("high-degree of inter-firm communications" was insufficient circumstantial evidence of conspiracy where "chat messages in the complaint did not evidence sharing of information that would have been necessary to a fix-suppression scheme" and the "rest of the chats describe coordinated trading

16

and sharing of order flow information that is either inapposite to or inconsistent with a fix-suppression scheme").

**Third**, the statistical analyses that Plaintiff recycles from the complaint in *In re GSE Bonds* in an attempt to show the impact of the alleged conspiracy on GSE bond prices (*e.g.*, SAC ¶ 210) are irrelevant because, even assuming that the statistics are accurate (and there is no indication that they are), the results say nothing about whether any particular defendant participated in the alleged conspiracy. Addressing substantially similar allegations, Judge Rakoff held in *In re GSE Bonds* that allegations based on statistical analyses regarding prices "do not plausibly suggest that the particular defendants named . . . were part of that conspiracy." 396 F. Supp. 3d at 365. Thus, the statistics provide no basis for inferring that Jefferies participated in the alleged conspiracy because "[e]ven assuming that the price-fixing conspiracy extended beyond the banks appearing in the chatroom logs, there is no particular reason to believe that [Jefferies was] involved apart from plaintiffs' say-so." *Id.*; *see In re European Bonds Antitrust Litig.*, No. 19 Civ. 2601, Dkt. 115, at p. 58 (S.D.N.Y. July 23, 2020) (finding that "none of the allegations above provide a basis to infer the culpability of any specific named defendant" due to reliance on "average statistics, which may flatten or hide trends that might tell different stories").

The antitrust claim against Jefferies thus fails and should be dismissed.

## II.     PLAINTIFF'S LUTPA CLAIM SHOULD BE DISMISSED

Plaintiff's LUTPA claim against Jefferies fails for several independent reasons.[7]

**First**, the claim is barred by the statute's exemptions for financial institutions directly or indirectly regulated by federal and Louisiana agencies. LUTPA does not apply to "[a]ny federally insured financial institution, its subsidiaries, and affiliates or any licensee of the Office

---

[7] Jefferies joins in the arguments made by other Defendants in their motions to dismiss the Second Amended Complaint with respect to Plaintiff's LUTPA claim.

of Financial Institutions, its subsidiaries, and affiliates . . . or federal banking regulators who possess authority to regulate unfair or deceptive trade practices." La. Stat. Ann. § 51:1406(1). "The purpose of this exemption is 'to avoid duplication and exclude financial institutions which are regulated by other authorities as to unfair or deceptive trade practices.'" *Mariche v. Wells Fargo Bank, N.A.*, No. 11-CV-1191, 2012 WL 1057626, at *2 (E.D. La. Mar. 28, 2012) (citation omitted). Financial institutions are broadly exempted by this provision no matter the capacity in which they act. *See Truong v. Bank of Am., N.A.*, 717 F.3d 377, 387 (5th Cir. 2013) ("The Louisiana Legislature has decided that LUTPA should not apply to '[a]ny federally insured financial institution, its subsidiaries, and affiliates,' and has not set out *any* exception to this broad rule." (alteration in original) (emphasis added) (quoting La. Rev. Stat. § 51:1406(1))).

Jefferies is exempted by the statute's bar on claims against affiliates of financial institutions licensed by the Louisiana Office of Financial Institutions. As noted *supra* n.2, Jefferies is an affiliate of Jefferies LLC, which is a licensed broker dealer in Louisiana. *FINRA BrokerCheck Report: Jefferies LLC CRD# 2347*, https://files.brokercheck.finra.org/ firm/firm_2347.pdf (last visited July 27, 2020) (showing that Jefferies LLC has been registered as a broker dealer in Louisiana since April 20, 1983). LUTPA itself thus provides a categorical barrier to asserting claims against Jefferies. La. Stat. Ann. § 51:1406(1) ("The provisions of this Chapter shall not apply to … any licensee of the Office of Financial Institutions, its subsidiaries, and affiliates.").

**Second**, Plaintiff does not, and cannot, allege that any statements by Jefferies about its experience in investment products and services were unfair or deceptive in any way. Plaintiff does not specify a single statement made to it by Jefferies, much less meet the heightened pleading standards under Rule 9(b). *See, e.g.*, *Brand Coupon Network, LLC v. Catalina Mktg.*

18

*Corp.*, No. 11-CV-00556 (BAJ), 2014 WL 6674034, at *5 (M.D. La. Nov. 24, 2014) ("Where a plaintiff's LUTPA claim is based on alleged fraudulent misrepresentation, the LUTPA claim must meet the heightened pleading requirements of Rule 9(b) [requiring the] complaint to . . . specif[y] 'the time, place and contents of the false representation, as well as the identity of the person making the misrepresentation and what that person obtained thereby.'") (quoting *U.S. ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 186 (5th Cir. 2009)).

     *Third*, Plaintiff does not allege that Jefferies did anything with the specific intent to harm competition.  LUTPA declares unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."  La. Stat. Ann. § 51:1405(A).  "'[T]he range of prohibited practices under LUTPA is extremely narrow,' as LUTPA prohibits only fraud, misrepresentation, and similar conduct, and not mere negligence." *Quality Envtl. Processes, Inc. v. I.P. Petroleum Co.*, 144 So. 3d 1011, 1025 (La. 2014); *see also Caldwell Wholesale Co. v. RJ Reynolds Tobacco Co.*, 781 F. App'x 289, 295 (5th Cir. 2019) ("Caldwell argues that the buydown system is anticompetitive—and therefore, unlawful—but only because RJR has refused Caldwell's requests for reentry into the system.  That theory falls well short of the tortious conduct that has been found to support LUTPA allegations.").  For that reason, a "defendant's motivation is a critical factor—his actions must have been taken with the specific purpose of harming . . . competition." *Jeanes v. McBride*, No. 16-CV-1259, 2019 WL 2387863, at *13 (W.D. La. June 4, 2019) (quoting *IberiaBank v. Broussard*, 907 F.3d 826, 839-40 (5th Cir. 2018)).

     Here, Plaintiff alleges nothing about Jefferies's motivation, and that failure is particularly telling because the allegedly unlawful communications were among members of lawful syndicates, who must exchange information and make joint decisions as part of their duties.  *See*

*Adams v. Pilgrim's Pride Corp.*, 182 F. Supp. 3d 679, 683 (E.D. Tex. 2016) ("Nothing in the evidence meets the high standard of 'egregious actions involving elements of fraud, misrepresentation, deception, or other unethical conduct' required for a violation of [LUTPA]."). Additionally, Plaintiff fails to allege it ever communicated with Jefferies, that Jefferies ever discussed manipulating a transaction involving Plaintiff, or even that Jefferies discussed pricing for GSE bonds outside a lawful syndicate. Thus, Plaintiff has failed to allege that Jefferies acted with the specific purpose of harming competition.

**Fourth**, to recover damages, a LUTPA plaintiff must have suffered an "ascertainable loss" caused "as a result" of the actions of "another person." *See* LA. REV. STAT. ANN. § 51:1409(A). Louisiana courts interpreting LUTPA have required plaintiffs to allege an actual loss of money that was caused by defendants' actions. *See, e.g., Bolanos v. Madary*, 609 So. 2d 972, 977 (La. App. 1992), *writ denied*, 615 So. 2d 339 (La. 1993); *see also Bobby & Ray Williams P'ship v. The Shreveport La. Hayride Co.*, 38, 224 (La. App. 2 Cir. 4/21/04), 873 So. 2d 739, 746 (no cause of action under LUTPA in the absence of allegations of ascertainable loss). General allegations of damage are insufficient. *See, e.g., Chemtreat, Inc. v. Andel*, No. Civ. A. 03-1917, 2003 WL 22466235, at *3 (E.D. La. Oct. 29, 2003) ("simply requesting damages is not enough to demonstrate" ascertainable loss). Hence, Plaintiff is required not only to allege that it "suffer[ed] an ascertainable loss," but also that the loss resulted from "another's use of unfair methods of competition and unfair or deceptive acts or practices." *See NOLA 180 v. Treasure Chest Casino, LLC*, 11-853 (La. App. 5 Cir. 3/27/12), 91 So. 3d 446.

Plaintiff has failed to do that here. In support of its LUTPA claim, Plaintiff alleges that it paid "higher than normal prices for fixed rate securities." SAC ¶ 293. But, as explained *supra* § 1, Plaintiff fails to allege that Jefferies participated in the alleged antitrust conspiracy. Nor has it

alleged facts demonstrating any ascertainable loss resulting from GSE bonds allegedly sold by Jefferies; or any loss caused by Jefferies's supposedly "deceptive" representations concerning its investment experience and services; or that GSE bonds—a financial instrument in which Plaintiff has "historically invested" (SAC ¶ 1)—were unsuitable investments. Plaintiff has not adequately pleaded a LUTPA damages claim because it fails to plead that the alleged "unfair methods of competition and unfair or deceptive act[] or practice[]" actually caused the alleged harm it asserts. *See NOLA 180*, 91 So. 3d at 449-50 (setting forth a "two-prong test" for determining whether a plaintiff can "sustain a cause of action under LUTPA").[8]

## III.    PLAINTIFF'S NEGLIGENCE CLAIM SHOULD BE DISMISSED

To state a claim for negligence under Louisiana law, a plaintiff must allege that "(1) the defendant had a duty to conform his conduct to a specific standard (the duty element); (2) the defendant's conduct failed to conform to the appropriate standard (the breach element); (3) the defendant's substandard conduct was a cause in fact of the plaintiff's injuries (the cause-in-fact element); (4) the defendant's substandard conduct was a legal cause of the plaintiff's injuries (the scope of liability or scope of protection element); and (5) the actual damages (the damages element)." *Lemann v. Essen Lane Daiquiris, Inc.*, 2005-1095 (La. 3/10/06); 923 So. 2d 627, 633. Because Plaintiff has failed to plead facts sufficient to establish any of these requisite elements, its negligence claim should be dismissed.

---

[8] Even if the LUTPA claim were adequately pleaded—and it is not—the provision of LUTPA under which Plaintiff sues does not permit a claim for damages on behalf of the State. *See* La. Rev. Stat. Ann. § 51:1408(A); *see also State v. Astra Zeneca AB*, 2016-1073 (La. App. 1 Cir. 4/11/18), 249 So. 3d 38, 45-46 ("LUTPA expressly gives the Attorney General the right to bring an action for injunctive relief (La. R.S. 51:1407A) and request civil penalties (La. R.S. 51:1407B) and restitution (La. R.S. 51:1408(5))") (citing *State v. Abbott Labs., Inc*., 2015-1626 (La. App. 1 Cir. 10/21/16), 208 So. 3d 384, 389). Damages are available only in "private actions" brought pursuant to Section 1409 of the LUTPA (La. Rev. Stat. Ann. § 51:1409(A))—a provision that is not mentioned in the SAC. *See Camowraps, LLC v. Quantum Digital Ventures LLC*, Civil Action No. 13-6808, 2015 WL 2229280, at *2 (E.D. La. May 12, 2015) (distinguishing the remedies available to Louisiana and to private parties). Thus, Plaintiff is not entitled to seek money damages under LUTPA.

A.     **Plaintiff Has Failed to Establish That Jefferies Owed Louisiana Any Legally Cognizable Duty**

A threshold issue in any negligence action is whether the defendant owed the plaintiff a duty of care. *Meany v. Meany*, 94-0251 (La. 7/5/94), 639 So. 2d 229, 233. Here, Plaintiff baldly asserts that Jefferies "owed a duty of care to their customers, including the State of Louisiana" and posits—without a single factual supporting allegation—that Jefferies had "a duty to ensure that the investments that [it] offered or brokered were suitable for the State of Louisiana as a client, and a duty to use reasonable care in recommending investments to the State of Louisiana." SAC ¶ 279. But Plaintiff cannot invent a duty out of thin air. There must be some statutory, regulatory, contractual or other obligation giving rise to such a duty (*Faucheaux v. Terrebonne Consol. Gov't*, 615 So. 2d 289, 292 (La. 1993)), and none is pled here.

The law does not impose a general duty of care between parties entering into an arm's length transaction, and Plaintiff has failed to specify the source of any duty that would give rise to a negligence claim. The State and Jefferies were simply trading counterparties,[9] and dealings between such entities "are generally considered to be arm's length transactions which do not impose any independent duty of care." *Guimmo v. Albarado*, 99-286 (La. App. 5 Cir. 7/27/99), 739 So. 2d 973, 975. Although Plaintiff alleges that it entered into a contract with Jefferies to purchase GSE bonds (SAC ¶ 276), it does not identify any such contract—let alone any

---

[9] Even if Plaintiff had been a Jefferies customer, it is hornbook law that, absent the grant of discretionary authority over an account (which Plaintiff does not claim occurred here), financial brokers owe only limited duties to their customers, such as a duty to execute a requested transaction. *See, e.g.*, *De Kwiatkowski v. Bear, Stearns & Co.*, 306 F.3d 1293, 1306 (2d Cir. 2002) ("We are aware of no authority for the view that, in the ordinary case, a broker may be held to an open-ended duty of reasonable care, to a nondiscretionary client, that would encompass anything more than limited transaction-by-transaction duties."); *Indep. Order of Foresters v. Donald, Lufkin & Jenrette, Inc.*, 157 F.3d 933, 940-41 (2d Cir. 1998) (in a nondiscretionary account, "the broker's duties are quite limited," including only the duty to obtain client's authorization before making trades and to execute requested trades); *Martinez Tapia v. Chase Manhattan Bank, N.A.*, 149 F.3d 404, 412 (5th Cir. 1998) (holding that "where the investor controls a nondiscretionary account and retains the ability to make investment decisions, the scope of any duties owed by the broker will generally be confined to executing the investor's order").

contractual provisions under which Jefferies provided "investment advice" to the Plaintiff or that would give rise to a purported duty to offer "suitable" investments. *Id.* ¶ 279; *see*, *e.g.*, *Satterfeal v. LoanCare, LLC*, No. 3:18-1021-JWD-EWD, 2019 WL 5777379, *4 (M.D. La. Nov. 5, 2019) (dismissing negligence claim where plaintiffs "failed to allege sufficient facts to show that [defendant] specifically owed them a duty of care"); *see also D & J Tire, Inc. v. Bank One, La., Nat'l Ass'n,* 2002-0935 (La. App. 3 Cir. 2/5/03), 838 So. 2d 112, 114 (trial court erred in finding liability for negligent misrepresentation absent a contractual relationship giving rise to a duty of care).

Nor can Plaintiff salvage its claims by arguing that Jefferies owed ***implied*** fiduciary duties to Plaintiff because any such argument is "clearly foreclosed by Louisiana law." *See Grodner & Assocs., APLLC v. Regions Bank*, 338 F. Supp. 3d 488, 502 (M.D. La. 2018) (Dick, J.), *aff'd*, 766 F. App'x 12 (5th Cir. 2019). Louisiana Revised Statute § 6:1124 provides that "[n]o financial institution . . . shall be deemed or implied to be acting as a fiduciary, or have a fiduciary obligation or responsibility to its customers or to third parties . . . unless there is a written agency or trust agreement under which the financial institution specifically agrees to act and perform in the capacity of a fiduciary." LA. REV. STAT. ANN. § 6:1124; *see also Whitfield v. Countrywide Home Loans, Inc.*, 252 F. App'x 654, 656 (5th Cir. 2007) (affirming dismissal of fiduciary duty claim because plaintiffs failed to identify a writing imposing fiduciary obligations); *Westside–Marrero Jeep Eagle, Inc. v. Chrysler Corp, Inc.*, 56 F. Supp. 2d 694, 702-03 (E.D. La. 1999) (no implied fiduciary duty between a financial institution and a borrower).

In short, the SAC fails to plead the source of any duty Jefferies allegedly owed to Plaintiff, and the negligence claim should therefore be dismissed. *See Bluebonnet Hotel Ventures, L.L.C. v. Wachovia Bank, N.A.*, No. CV 10-489-JJB-DLD, 2011 WL 13074300, at *9-

10 (M.D. La. Sept. 29, 2011) (plaintiff "cannot plausibly support a negligence claim" where "the facts as alleged simply fail to establish any special relationship" giving rise to a duty of care).

**B.    The SAC Contains No Allegations Sufficient to Show That Jefferies Breached Any Alleged Duty**

Even if Plaintiff had sufficiently pled a cognizable duty (which it has not), it fails to plead any facts sufficient to show that any such duty was breached.  Plaintiff, for example, fails to plead any facts that would plausibly explain how Jefferies knew about or could reasonably have discovered the existence of the alleged conspiracy.  Plaintiff merely makes the conclusory assertion that Jefferies knew or should have known that the bonds it allegedly sold to Louisiana "were the subject of a fraud or scam; i.e., the unlawful price fixing scheme of the remaining 'chat room' defendants."  SAC ¶ 286.  Plaintiff's own allegations, however, undermine this unsupported assertion.  It alleges that the "conspiracy was inherently self-concealing because it relied on secrecy for its successful operation" (*id.* ¶ 298), and that Plaintiff "was not aware of Defendants' misconduct and could not have discovered it through the exercise of due diligence until June 2018, when the DOJ's price-fixing investigation was revealed publicly for the first time."  *Id.* ¶ 299.  With no allegations showing that Jefferies had or should have had such knowledge, and none showing that Jefferies itself participated in the alleged conspiracy (*see supra* § I.), the SAC pleads no basis upon which to plausibly infer that Jefferies should have been aware of this "secret" conspiracy.

Nor does the SAC allege facts supporting Plaintiff's claim that GSE bonds were not "suitable" investments for Louisiana.  SAC ¶ 279.  Again, Plaintiff elsewhere alleges exactly the opposite—that state statutes and investment policies limit the type of investments that Louisiana can make and that, as a result of those restrictions, Louisiana has historically invested in GSE bonds.  *Id.* ¶ 1.  Plaintiff also alleges that the GSE bonds at issue are of "high credit quality" (*id.*

¶ 120), pay fixed rate returns (*id.* ¶ 125), and "[i]f held to maturity, they preserve their principal and offer certainty of cash flow." *Id.* The only reasonable inference that can be drawn from Plaintiff's own allegations is that the GSE bonds at issue ***were*** suitable investments. Thus, Plaintiff has failed sufficiently to plead the existence or breach of any invented duty of care.

## **<u>CONCLUSION</u>**

For these reasons, the Court should dismiss all claims in the SAC against Jefferies.

Dated: July 27, 2020                         Respectfully submitted,

*/s/ Winstol D. Carter*
Winstol D. Carter (La. Bar No. 03939)
MORGAN, LEWIS & BOCKIUS LLP
1000 Louisiana Street, Suite 4000
Houston, TX 77002-5005
Telephone: (713) 890-5000
Facsimile: (713) 890-5001
winn.carter@morganlewis.com

25

Jon R. Roellke (*pro hac vice*)
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue NW
Washington, DC 20004-2541
Telephone: (202) 739-3000
Facsimile: (202) 739-3001
jon.roellke@morganlewis.com


Kenneth I. Schacter (*pro hac vice*)
Jawad B. Muaddi (*pro hac vice*)
MORGAN, LEWIS & BOCKIUS LLP
101 Park Avenue
New York, NY 10178-0060
Telephone: (212) 309-6000
Facsimile: (212) 309-6001
kenneth.schacter@morganlewis.com
jawad.muaddi@morganlewis.com

**Attorneys for Jefferies Group LLC**

## CERTIFICATE OF SERVICE

I certify that on July 27, 2020, I served the foregoing on all counsel of record by filing the

pleading with the court's electronic court filing (ECF) system, which automatically notifies all

counsel.


*/s/ Winstol D. Carter*
Winstol D. Carter