# UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

STATE OF LOUISIANA,
By and through its,
Attorney General
JEFF LANDRY

VERSUS

BANK OF AMERICA, N.A., et al.

CIVIL ACTION

19-638-SDD-SDJ

## RULING

In this matter before the Court is a *Motion to Dismiss*[1] filed by Defendant, Stifel, Nicolaus & Co., Inc. ("Stifel"). Plaintiff, the State of Louisiana ("Plaintiff") filed an *Opposition*[2] to this motion, to which Stifel filed a *Reply*.[3] For the following reasons, the Court finds that Stifel's *Motion* should be granted, and this action shall be dismissed with prejudice as to Stifel.

## I.    BACKGROUND

### A.  Government Sponsored Entity ("GSE") Bonds

Plaintiff alleges a vast price fixing conspiracy among over twenty competitors in the GSE bond market from 2009 to 2016 ("Defendants"). GSEs, such as Fannie Mae and Freddie Mac, are privately run companies sponsored by the federal government.[4] GSEs issue bonds to finance their operations.[5]

---

[1] Rec. Doc. No. 145.
[2] Rec. Doc. No. 155.
[3] Rec. Doc. No. 160.
[4] Rec. Doc. No. 130, p. 29.
[5] *Id.* at 30.

64462

GSE bonds share several pertinent characteristics. The "face value" of a GSE bond is the amount of money that the GSE owes the bondholder when the bond matures.[6] The length of time between the issuance of the bond and the date it matures is known as its "maturity."[7] Fixed-rate bonds pay a fixed rate of interest or fixed "coupon"[8] annually and have fixed maturities.[9] Short-term GSE bonds do not offer coupon payments but instead are issued at a discount to face value.[10] The bond purchaser thus earns interest from the bond in an amount equal to the difference between the price paid and the face value at maturity.[11] Long and medium-term bonds, on the other hand, offer coupons.[12] Prior to maturity, the market value of fixed-rate GSE bonds will typically rise in a falling interest rate market, and typically fall in a rising interest rate market.[13] When the price of a bond falls, the yield from that bond rises.[14] GSE bonds are issued on a regular basis several times a month. The most recently issued bonds are referred to as "on-the-run," while older bonds with similar characteristics are referred to as "off-the-run."[15]

GSEs do not issue bonds directly to investors themselves. Rather, they utilize a group of "Approved GSE Bond Dealers" who underwrite the bonds.[16] The Defendants are GSE Bond Dealers.[17] GSEs choose Approved GSE Bond Dealers to underwrite new bonds in one of three ways: first, by "mandate," which is when the GSE requires a group

---

[6] *Id.* at 31.
[7] *Id.*
[8] A coupon is a periodic interest payment from the GSE to the bond holder. *Id.* at 32.
[9] *Id.* at 31.
[10] *Id.* at 32.
[11] *Id.*
[12] *Id.*
[13] *Id.* at 31–32.
[14] *Id.* at 32.
[15] *Id.* at 30–31.
[16] *Id.* at 33.
[17] *Id.*

of Approved Bond Dealers to place a new bond;[18] second, by "auction" which is when Approved Bond Dealers bid for the right to market the new bond;[19] and, third, in response to a "reverse inquiry" from Approved GSE Bond Dealers who request a specific type of bond.[20] GSEs utilize a point system to reward Approved GSE Bond Dealers who participate in GSE bond auctions.[21] GSEs award more business to those with more points.[22]

The structure of the auction process requires collaboration between competitors. Approved Bond Dealers are permitted to work together in groups called syndicates to submit bids.[23] If awarded the bonds, the syndicate of Approved Bond Dealers work together during the "syndication phase" to place the bonds with a buyer in the "primary market."[24] The Approved Bond Dealers' traders lawfully communicate in multi-bank chatrooms during the syndication phase to set prices.[25] The investors in the primary market are bulk buyers, often regional banks, who usually buy and hold the bonds as an investment and do not re-sell them to others.[26] When the syndication period ends, the Approved GSE Bond Dealers declare the bonds not sold in the primary market "free-to-trade" ("FTT") and secondary market trading begins.[27] The critical feature of the market for antitrust purposes is this: during the syndication phase, Approved Bond Dealers are expected to cooperate to set prices, but once the bonds are declared FTT, those same

---

[18] *Id.*
[19] *Id.*
[20] *Id.*
[21] *Id.*
[22] *Id.*
[23] *Id.* at 33–34.
[24] *Id.* at 34.
[25] *Id.*
[26] *Id.*
[27] *Id.*

Approved Bond Dealers are forbidden from fixing prices and instead must compete—presumably by undercutting each other's prices.[28]

Investors like Plaintiff buy bonds in the secondary market by reaching out directly to Approved Bond Dealers.[29] The employees at the Approved Bond Dealers' trading desks send the price quote directly to the investor without disseminating it to the investing public.[30] The "bid price" is the price at which a bond dealer is willing to sell a given bond, while the "ask price" is the price at which the same bond dealer is willing to buy the same bond.[31] The "bid-ask spread" can be a measure of the dealer's profit; the wider the bid-ask spread, the greater profit to the bond dealer and higher the transaction cost to the customer.[32] The breadth of the bid-ask spread is determined in part by transaction volume or "liquidity."[33] As liquidity increases, the bid-ask spread narrows which reflects a theoretically lower risk that changing market conditions will negatively affect bond prices while the dealer searches for a buyer.[34] In other words, in a highly liquid market, because the dealer can easily sell the bond should the market shift, there is lower risk.

### B. Plaintiff's Allegations

Plaintiff alleges that Defendants conspired to fix the prices of GSE bonds after the bonds were designated FTT in violation of § 1 of the Sherman Act and the Louisiana Unfair Trade Practices and Consumer Protection Act ("LUTPA"). Plaintiff also alleges that Defendants acted negligently in selling GSE bonds to Plaintiff. Plaintiff alleges that Defendants colluded in multi-bank chatrooms to fix the FTT price before declaring the

---

[28] *Id.*
[29] *Id.* at 35.
[30] *Id.* at 37.
[31] *Id.*
[32] *Id.*
[33] *Id.* at 38.
[34] *Id.*

bonds FTT and that the same traders continued to fix the price after the bonds were declared FTT.[35]

Plaintiff alleges that features of the GSE bond market fostered collusion among Defendants. First, Plaintiff points out that the GSE issuance process puts horizontal competitors together in multi-bank chatrooms.[36] Further, Plaintiff alleges that Defendants should have had systems in place to prevent communication between traders after the bonds were declared FTT but did not.[37] Moreover, Plaintiff alleges that because customers typically contact only a limited number of traders before executing a trade in the secondary market, Defendants were able to obtain an informational advantage over investors by communicating regarding customer strategies, demands, and positions.[38]

Second, Plaintiff alleges that GSE bond traders had social relationships and that these relationships were often strengthened by prior overlapping employment.[39] Specifically, Plaintiff alleges that traders "moved fluidly among positions at the various banks" throughout the seven-year conspiracy.[40] Plaintiff also alleges that the traders were able to communicate at social events.

Third, Plaintiff alleges that the GSEs themselves and general market conditions fostered collusive behavior among the bond dealers. Specifically, Plaintiff alleges that the GSE's practice of awarding lucrative underwriting privileges based on bond dealers' success in the secondary market incentivized the bond dealers to collude in the secondary market.[41] That collusion, alleges Plaintiff, ensured that all Defendants could

---

[35] *Id.* at 40–59.
[36] *Id.* at 60–61.
[37] *Id.* at 60.
[38] *Id.* at 61.
[39] *Id.* at 62.
[40] *Id.*
[41] *Id.* at 63.

maintain sufficient volume in the secondary market to continue to receive primary issuance opportunities from the GSEs.[42] Moreover, Plaintiff alleges that, in the wake of the 2008 recession, investors turned to less risky investments like GSE bonds.[43]

Fourth, Plaintiff alleges that there is a high level of industry concentration in the GSE bond market.[44] Specifically, Plaintiff alleges that sixteen companies, many of whom are named defendants, control 77.16% of the market share.[45]

Fifth, Plaintiff alleges that economic analysis of GSE bond prices suggests that the prices were artificially inflated. Specifically, Plaintiff asserts that during the alleged conspiracy period, the average difference between the price that Approved Bond Dealers bought a particular type of GSE bond and the price that the bond dealers sold the same bond was 10.6 basis points.[46] In contrast, after the alleged conspiracy, the difference for the same type of bond was 1.2 basis points.[47] Plaintiff avers that this decrease in prices would not have been observed in a competitive market.[48] Plaintiff further alleges that comparison of the prices of GSE bonds to the prices of comparable U.S. Treasury bonds, which are affected by the same macroeconomic factors, suggests that the prices of GSE bonds were artificially inflated between 2009 and 2016.[49]

Sixth, Plaintiff alleges that newly issued bonds are priced in reference to the most recent on-the-run bonds, which then become off-the-run once the new bonds are

---

[42] *Id.*
[43] *Id.*
[44] *Id.* at 64.
[45] *Id.* at 36.
[46] *Id.* at 67. "The term 'basis point' is used to compare price and yield. Each percentage point is divided into 100 basis points, or 'bp.' A basis point therefore refers to 1/100[th] of one percent. As an example, the difference between an interest rate yield of 6% and 6.12% is 12 bp." *Id.* at n. 27.
[47] *Id.* at 67.
[48] *Id.* Plaintiff buttresses this analysis by reference to nonexistent "Figures." *Id.* at 68–69.
[49] *Id.* at 68–69.

issued.[50] Plaintiff asserts that Defendants took advantage of this feature of the market by fixing the price of the off-the-run bonds which then inflated the price of the new on-the-run bonds.[51] Specifically, Plaintiff alleges that bonds about to go off-the-run experienced a statistically significant price increase in the two days leading up to a new issuance.[52] Plaintiff argues that the value of those bonds should decrease in the days leading up to a new issuance since investors would prefer to wait to buy the new issuance because the higher liquidity of the new issuance should yield lower prices.[53] Moreover, Plaintiff alleges that this price inflation only occurred in transactions involving customers—not in transactions between the Defendants themselves.[54] Plaintiff further alleges that bid-ask spreads for GSE bonds were artificially widened and supports this allegation with the assertion that the average relative bid-ask spreads[55] was 35.4 basis points between 2009 and 2016, but only 18.6 basis points after that time period.[56]

Seventh, Plaintiff alleges that Defendants failed to properly supervise their traders, and Plaintiff asserts that Defendants' practice of using performance-based compensation for its traders encouraged collusive behavior.[57] Plaintiff further argues that Defendants' failure to adequately supervise their employees in the past has led to documented instances of collusive behavior.[58]

---

[50] *Id.* at 69–70.
[51] *Id.* at 70.
[52] *Id.*
[53] *Id.* at 70–71.
[54] *Id.* at 71.
[55] Plaintiffs calculated these figures by comparing millions of quotes form the alleged conspiracy period with millions of quotes from after. Plaintiff then excluded the top and bottom 5% of quotes to exclude outliers. Finally, Plaintiff adjusted the spreads in the bid-ask quotes in the sample to account for the differences in the notional amount of the GSE bonds quoted. *Id.* at 74–75. Plaintiff buttressed its analysis with reference to a nonexistent "Figure."
[56] *Id.* at 74–75.
[57] *Id.* at 76.
[58] *Id.* at 78–81.

Plaintiff argues that the following alleged chatroom transcript from June 4, 2013, between a Stifel trader and Mizuho trader (another defendant), is direct evidence of a conspiracy:

>Stifel Nicolaus Trader: 99.00 FTT?
>
>[…][59]
>
>Mizuho Securities Trader: par less 1.00
>
>Stifel Nicolaus Trader: Cool
>
>[…][60]
>
>Stifel Nicolaus Trader: u wanna run an upsize cost?
>
>Mizuho Securities Trader: […][61] ran one and got back 99.87 ..[62]

was gonna wait til it got back to 99.85

>Mizuho Securities Trader: You cool w/ that?
>
>Stifel Nicolaus Trader: yes
>
>Stifel Nicolaus Trader: i agree
>
>Mizuho Securities Trader: we should be closer now[63]

As to Plaintiff's LUTPA claims, Plaintiff asserts that each Defendant "engaged in deceptive business practices regarding the advertisement of their brokerage services, including making false statements regarding the use of their experience and skill in recommending investments."[64]

---

[59] In original.
[60] In original.
[61] In original.
[62] In original.
[63] Rec. Doc. No. 130, p. 57–58.
[64] *Id.* at 90.

As to Plaintiff's negligence claims, Plaintiff alleges that Stifel owed a duty to ensure that the investments they offered were suitable for Plaintiff and a duty to exercise reasonable care in recommending investments to Plaintiff.[65] Plaintiff avers that it relied on Stifel's representations of its skill and experience when Plaintiff "awarded them contracts to sell securities to the State of Louisiana."[66] Plaintiff argues that Stifel breached its duties by selling Plaintiff bonds whose prices had been artificially inflated.[67] Moreover, Plaintiff avers that Stifel should have known that the prices were artificially inflated and its failure to recognize that and avoid selling the bonds at inflated prices to Plaintiff was a breach of Stifel's duty to exercise reasonable care.[68]

Plaintiff requests treble damages, a permanent injunction restraining Defendants from engaging in anticompetitive conduct, costs, attorneys' fees, and expert fees.[69] Stifel moves to dismiss Plaintiff's claims under Rule 12(b)(6).

## II.    LAW AND ANALYSIS

There is a threshold issue of what the word "Defendants" means in the *Second Amended Complaint*. In many ways, this case is simply the doppelganger of a case in the Southern District of New York.[70] Plaintiff in this case, however, added several additional defendants not named in the New York action, including Stifel. Ordinarily, this would be no issue. But the most cursory read of Plaintiff's *Second Amended Complaint* shows that it is virtually a carbon copy of the *Third Amended Complaint* in the New York action.[71]

---

[65] *Id.* at 87.
[66] *Id.* at 89.
[67] *Id.*
[68] *Id.* at 89–90.
[69] *Id.* at 98.
[70] *In re GSE Bonds Antitrust Litig.*, Case No. 19-CV-1704.
[71] Compare *In re GSE Bonds Antitrust Litig.*, Case No. 19-CV-1704, Rec. Doc. No. 254 with the *Second Amended Complaint* in this case, Rec. Doc. No. 130.

According to Stifel, because the *Second Amended Complaint* is almost identical to the New York complaint, any references to "Defendants" in the *Second Amended Complaint* actually refer to the defendants in the New York complaint, where Stifel was not named.[72] As such, argues Stifel, Plaintiff's allegations regarding Stifel are few and far between and wholly insufficient to survive the motion to dismiss stage.

Plaintiff anemically disputes that the *Second Amended Complaint* is largely verbatim of the *Third Amended Complaint* in the New York action,[73] but there are numerous mistakes in the *Second Amended Complaint* that can only be viewed as egregious typographical errors or examples of a haphazard copy-paste job. For example, Plaintiff contends that many of the named defendants in the New York case, including Barclays Capital Inc., Credit Suisse Securities (USA) LLC, J.P. Morgan Securities LLC, and Nomura Securities International, Inc., "are headquartered in this District."[74] In the ensuing pages of the *Second Amended Complaint*, Plaintiff contradictorily states that each of those entities are headquartered in New York.[75]

But this is not the most confounding error. The *Second Amended Complaint* is replete with references to "Plaintiffs and the Class" (the New York case is a putative class action, unlike the instant case which has but one plaintiff).[76] The chart purporting to show

---

[72] Rec. Doc. No. 145-1, p. 14–15.

[73] "While Stifel makes several comments in this [sic] memo about how the complaint contains a rote recitation of the Southern District of New York case, the fact that Stifel is even a defendant in this case demonstrates the absurdity of the argument." Rec. Doc. No. 155-1, p. 2.

[74] Rec. Doc. No. 130, p. 8.

[75] "Defendant Barclays Capital Inc. ("BCI") is a wholly owned subsidiary of Barclays Bank PLC, incorporated in the state of Connecticut, with its headquarters in New York…" *Id.* at 11. "Defendant Credit Suisse Securities (USA) LLC ("CS Securities") is a wholly owned subsidiary of Credit Suisse AG ("CS AG"), organized under the laws of Delaware and with its principal place of business in New York, New York." *Id.* at 18–19. "Defendant J.P. Morgan Securities LLC ("JPMS"), previously known as J.P. Morgan Securities Inc., is a Delaware limited liability company with its headquarters in New York, New York." *Id.* at 20. "Defendant Nomura Securities international, Inc. ("Nomura Securities") is a corporation organized under the laws of New York, with its principal place of business in New York, New York." *Id.* at 23.

[76] *Id.* at 6, 13, 33 (twice), 36, 59, 92 (twice), 97.

the percentage of all of the Defendants' market shares does not include market share information for any of the Defendants named here but not in the New York case.[77] Rather, it is identical to the chart in the *Third Amended Complaint* in the New York case.[78] The *Second Amended Complaint* also includes several references to nonexistent charts.[79] The *Second Amended Complaint* contains over 50 references to things that "Plaintiffs" either did or had done to them—but there is only one Plaintiff in this case.[80] Finally, a side-by-side comparison of the two complaints reveals that the vast majority of the *Second Amended Complaint* was copied from the New York complaint. While the Court finds Plaintiff's drafting sloppy, that fact does not yield the result advocated by Stifel.

While Stifel is likely correct that references to "Defendants" in the *Second Amended Complaint* were not intended to refer to Stifel as originally written, that does not change the fact that Stifel is a named defendant in this case. Thus, Plaintiff's use of the word "Defendants," regardless of its origin, must be construed to include Stifel. To find otherwise would require disregarding the literal meaning of the text in the *Second Amended Complaint* in favor of a subtextual meaning. The Court will interpret "Defendants" in the *Second Amended Complaint* to include Stifel and other Defendants named here but not in the New York case.

---

[77] *Id.* at 36.
[78] Compare *Id.* at 36 with *In re GSE Bonds Antitrust Litig.*, Case No. 19-CV-1704, Rec. Doc. No. 254, p. 35–36.
[79] Rec. Doc. No. 130, p. 68, "The data displayed in Figure 3…"; "In Figure 4, the vertical axis represents the difference between…" *Id.* at 69; The results of this analysis are show in Figure 6, below." *Id.* at 75.
[80] See *Id.*

### A.  Rule 12(b)(6) Motion to Dismiss

When deciding a Rule 12(b)(6) motion to dismiss, "[t]he 'court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.'"[81] The Court may consider "the complaint, its proper attachments, 'documents incorporated into the complaint by reference, and matters of which a court may take judicial notice.'"[82] "To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead 'enough facts to state a claim to relief that is plausible on its face.'"[83]

In *Twombly*, the United States Supreme Court set forth the basic criteria necessary for a complaint to survive a Rule 12(b)(6) motion to dismiss. "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do."[84] A complaint is also insufficient if it merely "tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"[85] However, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[86] In order to satisfy the plausibility standard, the plaintiff must show "more than a sheer possibility that the defendant has acted unlawfully."[87] "Furthermore, while the court must accept well-pleaded facts as true,

---

[81] *In re Katrina Canal Breaches Litigation*, 495 F.3d 191, 205 (5th Cir. 2007) (quoting *Martin v. Eby Constr. Co. v. Dallas Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004)).

[82] *Randall D. Wolcott, M.D., P.A. v. Sebelius*, 635 F.3d 757, 763 (5th Cir. 2011) (quoting *Dorsey v. Portfolio Equity, Inc.*, 540 F. 3d 333, 338 (5th Cir. 2008).

[83] *In re Katrina Canal Breaches Litigation*, 495 F.3d at 205 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)).

[84] *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations and brackets omitted) (hereinafter *Twombly*).

[85] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citations omitted) (hereinafter "*Iqbal*").

[86] *Id.*

[87] *Id.*

it will not 'strain to find inferences favorable to the plaintiff.'"[88] "[O]n a motion to dismiss, courts 'are not bound to accept as true a legal conclusion couched as a factual allegation.'"[89]

### B. Standing: Sherman Act Claims

Plaintiff must have standing to pursue an antitrust suit. Plaintiff must plead: (1) injury-in-fact—meaning an injury proximately caused by the defendants' conduct; (2) antitrust injury; and (3) proper plaintiff status, "'which assures that other parties are not better situated to bring suit.'"[90] Antitrust injury is "'injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation.'"[91] "Typically, parties with antitrust injury are either competitors, purchasers, or consumers in the relevant market."[92] The "proper plaintiff" inquiry examines "(1) whether the plaintiff's injuries or their causal link to the defendant are speculative, (2) whether other parties have been more directly harmed, and (3) whether allowing this plaintiff to sue would risk multiple lawsuits, duplicative recoveries, or complex damage apportionment."[93] "In determining antitrust standing, [the Court] assume[s] the existence of an antitrust violation."[94]

The second and third prongs of the antitrust standing inquiry are not seriously in dispute. Plaintiff's alleged injury is that it overpaid for bonds it bought and was underpaid

---

[88] *Taha v. William Marsh Rice Univ.*, 2012 WL 1576099, at *2 (S.D. Tex. May 3, 2012) (quoting *Southland Sec. Corp. v. Inspire Ins. Solutions, Inc.*, 365 F.3d 353, 361 (5th Cir. 2004).

[89] *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).

[90] *Waggoner v. Denbury Onshore, L.L.C.*, 612 F. App'x 734, 736 (5th Cir. 2015) (quoting *Doctor's Hosp. of Jefferson, Inc. v. Se. Med. Alliance, Inc.*, 123 F.3d 301, 305 (5th Cir.1997)).

[91] *Id.* at 737 (quoting *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489 (1977)).

[92] *Id.*

[93]  *Norris v. Hearst Tr.*, 500 F.3d 454, 465 (5th Cir. 2007).

[94] *Harry v. Total Gas & Power N. Am., Inc.*, 889 F.3d 104, 115 (2d Cir. 2018) (internal citations omitted).

for bonds it sold because of Stifel's alleged conspiracy to fix prices. This suffices to allege an antitrust injury. As to the proper plaintiff inquiry, Plaintiff alleges that it was a consumer in the allegedly price fixed market. Plaintiff, as the alleged purchaser of the allegedly price fixed bonds, is the party most directly harmed. Finally, allowing Plaintiff to sue over two-party bond transactions it entered into does not risk multiple lawsuits, duplicative recoveries, or complex damage apportionment.

The first prong, injury-in-fact, is in dispute. The injury-in-fact inquiry focuses on the "directness or indirectness of the asserted injury."[95] Plaintiff must allege that the "antitrust violation . . . cause[d] injury to the antitrust plaintiff."[96] "In a case involving a conspiracy to fix prices, the plaintiff must prove that the conspiracy in fact affected the prices paid."[97] Courts have found no injury where the plaintiff failed to allege any specific transactions that they entered into that harmed them.[98] Stifel argues, correctly, that Plaintiff does not allege that it purchased the bond at issue in the Stifel-Mizuho chat.[99] This is Plaintiff's third *Complaint* yet it still fails to allege that it purchased the bonds made the subject of the Stifel-Mizuho chat. Thus, the causation between Plaintiff's injuries, buying price fixed bonds and/or selling bonds at a supposedly depressed price, and Stifel's alleged injury-causing act, is attenuated at best.

---

[95] *Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 540 (1983).
[96] *Nichols v. Mobile Bd. of Realtors, Inc.*, 675 F.2d 671, 675 (5th Cir. 1982); *Robinson v. Texas Auto. Dealers Ass'n*, 387 F.3d 416, 422 (5th Cir. 2004).
[97] *In re Corrugated Container Antitrust Litig.*, 756 F.2d 411, 416 (5th Cir. 1985).
[98] See *In re SSA Bonds Antitrust Litig.*, 2018 WL 4118979, at *6 (S.D.N.Y. Aug. 28, 2018); *Harry v. Total Gas & Power N. Am., Inc.*, 244 F. Supp. 3d 402, 416 (S.D.N.Y. 2017) ("The plaintiffs' failure to allege a single specific transaction that lost value as a result of the defendants' alleged misconduct precludes a plausible allegation of actual injury."), aff'd as modified on other grounds, 889 F.3d 104 (2d Cir. 2018).
[99] Rec. Doc. No. 145-1, p. 11.

But Plaintiff's market analyses allegations are probative of the possibility of a conspiracy pervasive enough to affect some of Plaintiff's transactions. Plaintiff alleges that it entered into billions of dollars in GSE bond transactions from July 1, 2010 to June 30, 2011 and from July 1, 2012 to June 30, 2013 with Defendants.[100]  Plaintiff also alleges pricing data that shows artificially inflated bid-ask spreads, a higher price charged by Defendants to Plaintiff and others similarly situated during the conspiracy period as compared to after, and price fixing on bonds set to go off-the-run.[101] These allegations support the existence of a market-wide conspiracy; however, the market analyses relied upon by the Plaintiff[102] fails to distinguish among Defendants. While the pricing data surveyed may be suggestive of market-wide anticompetitive pricing, there are no allegations which plausibly indicate that *Stifel's* pricing was anticompetitive (besides the sole chatroom transcript). Similarly, there are no allegations to indicate that Stifel's alleged anticompetitive pricing injured Plaintiff because the blanket label of "Defendants" obscures the individuality of each Defendant. The lack of an allegation as to Stifel's market share exacerbates this problem.[103] Because Plaintiff does not allege Stifel's market share, it is impossible to determine the extent, if any, that Stifel's alleged pricing behavior influenced market prices.

Besides the chatroom conversation, Plaintiff's allegations related to Stifel are limited to: standard allegations of Stifel's type of business and place of business;[104] a bare allegation that it bought and sold bonds to and from Plaintiff between 2009 and

---

[100] Rec. Doc. No. 130, p. 81–84.
[101] *Id*. at 65–75.
[102] To the extent that it can be read to include Stifel, as Stifel argues it should not, based on its allegedly being copied from the New York complaint.
[103] Rec. Doc. No. 130, p. 36.
[104] *Id*. at 25.

2016;[105] an allegation that Stifel was an Approved Bond Dealer between 2009 and 2016;[106] an allegation that Plaintiff purchased $279,915,000 in bonds from Stifel and sold $3,000,000 in bonds to Stifel between July 1, 2010 and June 30, 2011;[107] and an allegation that Plaintiff purchased $183,650,000 in bonds from Stifel and sold $2,000,000 in bonds to Stifel between July 1, 2012 and June 30, 2013.[108] So, while Plaintiff argues that the *Second Amended Complaint* contains allegations that Stifel participated in the broader conspiracy and the extent of that participation, the Court finds that these allegations do not cross the threshold between mere possibility and plausibility.

The allegations as to Stifel are limited to the chatroom conversation with Mizuho and do not implicate Stifel in the broader conspiracy. While Plaintiff includes two and half pages of other chat transcripts in its *Opposition*, the Court cannot consider these transcripts as "it is axiomatic that a complaint cannot be amended by briefs in opposition to a motion to dismiss."[109] So, while Plaintiff alleges that Stifel engaged in price fixing as to one bond, there is nothing to connect that bond or Stifel to a broader scheme. Because there are no allegations plausibly suggesting that Stifel was part of a market-wide conspiracy, the market-wide analyses of pricing data that suggest a conspiracy[110] do not implicate Stifel. As such, Plaintiff's well-pleaded allegations as to Stifel are limited to the assertion that it fixed one bond and that Plaintiff entered into bonds transactions with Stifel in the same year. Courts have held that allegations that the plaintiff bought a bond from a defendant in the same 24-hour period the alleged price fixing occurred were insufficient

---

[105] *Id.*
[106] *Id.*
[107] *Id.* at 81–84.
[108] *Id.* at 81–84.
[109] *Davis v. Louisiana State Univ. & A&M Coll.*, 2019 WL 179580, at *5 (M.D. La. Jan. 11, 2019).
[110] And according to Stifel, should not be read to include Stifel.

to infer plausible actual damages.[111] That reasoning applies with greater force here. Plaintiff has failed to plausibly plead injury-in-fact, and as such, antitrust standing. Stifel's *Motion* is granted as to Plaintiff's antitrust claims.

### C. LUTPA Claim[112]

Plaintiff's LUTPA claim cannot survive Stifel's *Motion*. The LUTPA prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce . . . ."[113] "Louisiana has left the determination of what is an 'unfair trade practice' largely to the courts to decide on a case-by-case basis."[114] "The courts have repeatedly held that, under this statute, the plaintiff must show the alleged conduct 'offends established public policy and ... is immoral, unethical, oppressive, unscrupulous, or substantially injurious.'"[115] The Louisiana Supreme Court has explained that "the range of prohibited practices under LUTPA is extremely narrow."[116] Further, the United States Court of Appeals for the Fifth Circuit has held that "the statute does not provide an alternate remedy for simple breaches of contract. There is a great deal of daylight between a breach of contract claim and the egregious behavior the statute proscribes."[117]

The LUTPA contains an exception for:

Any federally insured financial institution, its subsidiaries, and affiliates or any licensee of the Office of Financial Institutions, its subsidiaries, and

---

[111] *In re SSA Bonds Antitrust Litig.*, 2018 WL 4118979, at *6–7 (S.D.N.Y. Aug. 28, 2018) (collecting cases).
[112] Neither party addresses whether Plaintiff has standing under the LUTPA. The Court will assume for the purposes of this *Ruling* that Plaintiff has standing; however, the Court notes that *Cheramie Services Inc. v. Shell*, which expanded LUTPA standing, was a *plurality* opinion of the Louisiana Supreme Court.
[113] La. R.S. § 51:1405(A).
[114] *Turner v. Purina Mills, Inc.*, 989 F.2d 1419, 1422 (5th Cir. 1993); *Cheramie Services, Inc. v. Shell Deepwater Production, Inc.*, 35 So.3d 1053, 1059 (La. 2010) ("It has been left to the courts to decide, on a case-by-case basis, what conduct falls within the statute's prohibition.").
[115] *Cheramie*, 35 So.3d at 1059 (citations omitted).
[116] *Id.* at 1060.
[117] *Turner*, 989 F.2d at 1422.

affiliates or actions or transactions subject to the jurisdiction of the Louisiana Public Service Commission or other public utility regulatory body, the commissioner of financial institutions, the insurance commissioner, the financial institutions and insurance regulators of other states, or federal banking regulators who possess authority to regulate unfair or deceptive trade practices.[118]

Stifel argues that this exception applies because its affiliate, Stifel Bank and Trust, is a federally insured bank and because Stifel is licensed by the Louisiana Office of Financial Institutions.[119] Moreover, Stifel asks this Court to take judicial notice of the fact that Stifel is registered to do business in Louisiana.[120] Plaintiff does not dispute this and, in fact, asserts that Stifel is licensed in Louisiana.[121] Because Plaintiff does not dispute Stifel's arguments, it concedes them.[122] Instead, Plaintiff relies on *Grant v. Houser*, a case from the Eastern District of Louisiana, for its argument that because Stifel is regulated by FINRA, the exception does not apply.[123]

In *Grant*, the court considered the defendant's argument that because it was registered with FINRA, it was exempt from the LUTPA.[124] The court concluded that FINRA registration was not a ground for the exception in La. R.S. § 51:1406(1), so the exception

---

[118] La. R.S. § 51:1406(1).
[119] Rec. Doc. No. 145-1, p. 21–22.
[120] See FINRA BrokerCheck Report: Stifel, Nicolaus & Co., Inc., CRD #793 https://files.brokercheck.finra.org/firm/firm_793.pdf at page 14, showing that Stifel has been registered in Louisiana since April 20, 1983. See *Tier Reit, Inc. v. Uvest Fin. Servs. Grp. Inc.*, 2016 WL 4039163, at *5 (N.D. Tex. July 28, 2016) (taking judicial notice of one of the parties' FINRA "BrokerCheck" report); *Wilkov v. Ameriprise Fin. Servs., Inc.*, 753 F. App'x 44, 46 (2d Cir. 2018) (holding that the district court was entitled to take judicial notice of one of the parties' FINRA "BrokerCheck" report).
[121] Rec. Doc. No. 155-1, p. 15–16. Plaintiff alleges in the *Second Amended Complaint* that Stifel "is licensed to do business in all 50 states." Rec. Doc. No. 130, p. 25.
[122] *Dipietro v. Cole*, No. CV 16-566-SDD-RLB, 2017 WL 5349492, at *3 (M.D. La. Nov. 13, 2017); *Omega Hosp., LLC v. United Healthcare Servs., Inc.*, 345 F. Supp. 3d 712, 740 (M.D. La. 2018). Moreover, as Stifel urges, the Court may take judicial notice of matter of public record. The FDIC lists Stifel Bank and Trust as a federally insured bank. See "FDIC Insured Bank Search Tool" https://banks.data.fdic.gov/bankfind-suite/bankfind.
[123] Rec. Doc. No. 155-1, p. 15–16; *Grant*, 2013 WL 2631433, at *4.
[124] *Id.*

did not apply.[125] The court did not conclude, however, that FINRA registration categorically barred the application of the exception, which is what Plaintiff asks this Court to hold.[126]

There is nothing in the exception to the LUTPA provided by La. R.S. § 51:1406(1) that excludes FINRA-regulated entities from its scope. In contrast, § 51:1406(1) contains broad language excluding from the LUTPA's application "[a]ny federally insured financial institution, its subsidiaries, and affiliates or any licensee of the Office of Financial Institutions, its subsidiaries…." As such, the LUTPA does not apply to Stifel.

This result accords with the purpose behind the exception which is to "'avoid duplication and exclude financial institutions which are regulated by other authorities as to unfair or deceptive trade practices.'"[127] Stifel's registration with the Louisiana Office of Financial Institutions places it under the Office's jurisdiction, and Stifel's affiliate's status as a federally insured bank compels its adherence to a bevy of federal statutes and regulations. Plaintiff's LUTPA claim is therefore dismissed.

### D. Negligence Claim

Plaintiff must allege five elements to state a claim for negligence:

(1) the defendant had a duty to conform his conduct to a specific standard (the duty element); (2) the defendant's conduct failed to conform to the appropriate standard (the breach element); (3) the defendant's substandard conduct was a cause in fact of the plaintiff's injuries (the cause-in-fact element); (4) the defendant's substandard conduct was a legal cause of the plaintiff's injuries (the scope of liability or scope of protection element); and (5) the actual damages (the damages element).[128] . . . A negative answer

---

[125] *Id.* at *4–5.
[126] *Id.*
[127] *Mariche v. Wells Fargo Bank*, 2012 WL 1057626, at *2 (E.D. La. Mar. 28, 2012) (citing *Carriere v. Proponent Federal Credit Union*, 2004 WL 1638250 at *7 (W.D.La. July 12, 2004)).
[128] *Audler v. CBC Innovis Inc.*, 519 F.3d 239, 249 (5th Cir. 2008) (citing *Lemann v. Essen Lane Daiquiris*, 923 So.2d 627, 633 (La. 2006)).

to any of the inquiries of the duty-risk analysis results in a determination of no liability.[129]

First, the Court must consider if Plaintiff has adequately alleged that Stifel owed it a duty.[130] "In deciding whether to impose a duty in a particular case, Louisiana courts examine 'whether the plaintiff has any law (statutory, jurisprudential, or arising from general principles of fault) to support the claim that the defendant owed him a duty.'"[131]

Plaintiff asserts that Stifel had the duties to: "ensure that the investments that they offered or brokered were suitable for the Plaintiffs [sic] as a client," "avoid unreasonable behavior which puts a client at risk of financial harm," "use reasonable care in recommending investments to the Plaintiffs [sic]," and "avoid recommending investments which it knew or should have known would constitute fraud or a scam."[132] Plaintiff contends that because Stifel is regulated by FINRA, it must abide by FINRA regulations, and those regulations create Stifel's duties to Plaintiff.[133]

Plaintiff argues that FINRA requires its members to disclose material information about investments to investors, to only recommend "suitable" investments to customers, and to provide the customer with the most favorable price under prevailing market conditions.[134] However, it is not at all clear that FINRA regulations can support a duty to Plaintiff. Plaintiff provides no authority to support its claim that FINRA regulations give rise to a duty,[135] and Stifel cites only to persuasive authority that FINRA regulations do not give rise to a duty.[136]

---

[129] *Id.* (citing *Mathieu v. Imperial Toy Corp.*, 646 So.2d 318, 321 (La. 1994)).
[130] *Id.* (citing *Meany v. Meany*, 639 So.2d 229, 233 (La. 1994)).
[131] *Id.* (citing *Faucheaux v. Terrebonne Consol. Gov't*, 615 So.2d 289, 292 (La. 1993)).
[132] Rec. Doc. No. 155-1, p. 16.
[133] *Id.*
[134] *Id.* at p. 16–17.
[135] *Id.* at p. 16–18.
[136] Rec. Doc. No. 160, p. 10.

Even assuming FINRA regulations may give rise to a duty, Plaintiff has failed to allege a breach of any duty. Plaintiff alleges that Stifel breached because it either participated in the conspiracy or did not discover that the GSE bonds were price fixed and sold them to Plaintiff.[137] Plaintiff argues that since it has alleged that Stifel was a member of the conspiracy and sold Plaintiff price fixed bonds, Plaintiff has adequately alleged a breach.[138]

As concluded above, Plaintiff has not adequately alleged that Stifel participated in the conspiracy, so Stifel's alleged participation cannot be the basis for the breach of any purported duty. As to Plaintiff's second argument, Plaintiff has alleged that Stifel should have known that the bonds it sold were price fixed, but Plaintiff makes no allegations as to how or why Stifel could. Plaintiff's allegations regarding Stifel's knowledge of the alleged price fixing are limited to the one chatroom conversation which does not establish that Stifel was a member of the broader conspiracy for the reasons stated above. On the contrary, Plaintiff argues that the conspiracy "was inherently self-concealing" and avers that it could not have discovered the price fixing until June 2018.[139]   Plaintiff provides no explanation for why it could not discover the conspiracy, but Stifel could, besides conclusory assertions that Stifel was a member of the conspiracy. On these facts, the only way that Stifel could have avoided the purported breaches of not disclosing that the

---

[137] Rec. Doc. No. 130, p. 89. Plaintiff's breach argument is:
> Secondly, Stifel's arguments that the Second Amended Complaint fails to allege that it breached any duty to the Plaintiff are founded on one incorrect principle: that due to the self-concealing nature of the breach, that it could not have discovered the conspiracy. Now that the Plaintiffs have uncovered evidence, as stated in the Second Am. Complaint that demonstrates that Stifel itself was a party to the conspiracy, while simultaneously brokering GSE bonds as well as a member institution regulated by FINRA, this argument fails resoundingly.

Rec. Doc. No. 155-1, p. 18.
[138] Rec. Doc. No. 155-1, p. 17.
[139] Rec. Doc. No. 130, p. 92.

bonds were price fixed and not selling price fixed bonds was by investigating and discovering an alleged price fixing conspiracy. However far Stifel's purported duty extended, it did not extend to making Stifel an investigatory agency.

For the foregoing reasons, Plaintiff has failed to allege a negligence claim and that claim is dismissed.

## III.   CONCLUSION

For the reasons above, Stifel's *Motion*[140] is granted. Plaintiff has now had three *Complaints*. There is no reason to believe on a fourth try, Plaintiff would finally cure these deficiencies. As such, Plaintiff's action as to Stifel is dismissed with prejudice.

**IT IS SO ORDERED.**

Signed in Baton Rouge, Louisiana on <u>March 30, 2021</u>.


_____
**CHIEF DISTRICT JUDGE SHELLY D. DICK**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

---

[140] Rec. Doc. No. 145.