## UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

STATE OF LOUISIANA,
By and through its,
Attorney General
JEFF LANDRY

                                                     CIVIL ACTION

VERSUS

                                                     19-638-SDD-SDJ

BANK OF AMERICA, N.A., et al.

### RULING

In this matter before the Court is a *Motion to Dismiss*[1] filed by Defendant, Mizuho Securities USA ("Mizuho"). Plaintiff, the State of Louisiana ("Plaintiff") filed an *Opposition*[2] to the *Motion*, to which Mizuho filed a *Reply*.[3] For the following reasons, the Court finds that Mizuho's *Motion* should be granted, and this action dismissed with prejudice as to Mizuho.

## I.    BACKGROUND

The State of Louisiana, the Plaintiff, alleges a vast price fixing conspiracy in the government-sponsored entity ("GSE") bond market from 2009 to 2016. The Court has recently reviewed the salient features of the GSE Bond market in a prior *Ruling*.[4] The term "Defendants" as used in this *Ruling* refers to every named defendant in this case.

---

[1] Rec. Doc. No. 152.
[2] Rec. Doc. No. 158.
[3] Rec. Doc. No. 171.
[4] *State of Louisiana v. Bank of America, N.A. et al*, 19-CV-638-SDD-SDJ, Rec. Doc. No. 179.

## II.    PLAINTIFF'S ALLEGATIONS

Plaintiff alleges that Mizuho conspired to fix the prices of GSE bonds after the bonds were designated "free to trade" ("FTT") in the secondary market in violation of § 1 of the Sherman Act and the Louisiana Unfair Trade Practices and Consumer Protection Act ("LUTPA"). Plaintiff also alleges that Mizuho acted negligently in selling GSE bonds to Plaintiff. Plaintiff alleges that Mizuho colluded in multi-bank chatrooms to fix the FTT price before declaring the bonds FTT and that the same traders continued to fix the price after the bonds were declared FTT.[5]

Plaintiff alleges that economic analysis of GSE bond prices suggests that the prices were artificially inflated. Specifically, Plaintiff asserts that during the alleged conspiracy period, the average difference between the price that Defendants bought a particular type of GSE bond and the price that the bond dealers sold the same bond was 10.6 basis points.[6] In contrast, after the alleged conspiracy, the pricing difference for the same type of bond was 1.2 basis points.[7] Plaintiff avers that this decrease in prices would not have been observed in a competitive market.[8] Plaintiff further alleges that comparison of the prices of GSE bonds to the prices of comparable U.S. Treasury bonds, which are affected by the same macroeconomic factors, suggests that the prices of GSE bonds were artificially inflated between 2009 and 2016.[9]

---

[5] *Id.* at 40–59.
[6] *Id.* at 67. "The term 'basis point' is sued to compare price and yield. Each percentage point is divided into 100 basis points, or 'bp.' A basis point therefore refers to 1/100th of one percent. As an example, the difference between an interest rate yield of 6% and 6.12% is 12 bp." *Id.* at n. 27.
[7] *Id.* at 67.
[8] *Id.* Plaintiff buttresses this analysis by reference to nonexistent "Figures." *Id.* at 68–69.
[9] *Id.* at 68–69.

65648

Plaintiff alleges that newly issued bonds are priced in reference to the most recent "on-the-run"[10] bonds, which then become off-the-run once the new bonds are issued.[11] Plaintiff asserts that Defendants took advantage of this feature of the market by fixing the price of the off-the-run bonds which then inflated the price of the new on-the-run bonds.[12] Specifically, Plaintiff alleges that bonds about to go off-the-run experienced a statistically significant price increase in the two days leading up to a new issuance.[13] Plaintiff argues that value of those bonds should decrease in the days leading up to a new issuance since investors would prefer to wait to buy the new issuance because the higher liquidity of the new issuance should yield lower prices.[14] Moreover, Plaintiff alleges that this price inflation only occurred in transactions involving customers—not in transactions between the Defendants themselves.[15] Plaintiff further alleges that bid-ask spreads for GSE bonds were artificially widened and supports this allegation with the assertion the average relative bid-ask spread[16] was 35.4 basis points between 2009 and 2016, but only 18.6 basis points after that time period.[17]

Plaintiff argues that the following alleged chatroom transcript from June 4, 2013, between a Mizuho trader and Stifel trader (another defendant), is direct evidence of a conspiracy:

---

[10] On-the-run bonds are those most recently issued by the GSEs. *Id*. at 70.

[11] *Id*. at 69–70.

[12] *Id*. at 70.

[13] *Id*.

[14] *Id*. at 70–71.

[15] *Id*. at 71.

[16] Plaintiffs calculated these figures by comparing millions of quotes from the alleged conspiracy period with millions of quotes from after. Plaintiff then excluded the top and bottom 5% of quotes to exclude outliers. Finally, Plaintiff adjusted the spreads in the bid-ask quotes in the sample to account for the differences in the notional amount of the GSE bonds quoted. *Id*. at 74–75. Plaintiff buttressed its analysis with reference to a nonexistent "Figure."

[17] *Id*. at 74–75.

Stifel Nicolaus Trader: 99.00 FTT?

[…][18]

Mizuho Securities Trader: par less 1.00

Stifel Nicolaus Trader: Cool

[…][19]

Stifel Nicolaus Trader: u wanna run an upsize cost?

Mizuho Securities Trader: […][20] ran one and got back 99.87 ..[21] was gonna wait til it got back to 99.85

Mizuho Securities Trader: You cool w/ that?

Stifel Nicolaus Trader: yes

Stifel Nicolaus Trader: i agree

Mizuho Securities Trader: we should be closer now[22]

Plaintiff argues that the following alleged chatroom transcript from March 20, 2012, between a Mizuho trader, a FTN Financial trader, and a Citigroup trader (both of whom are named defendants), is further direct evidence of a conspiracy:

Mizuho Securities Trader: what are we going to do in light of this new ml deal?

FTN Financial Trader: I have 8mm left but it does have 2.00 vs 1.50

Mizuho Securities Trader: I have 23mm

---

[18] In original.
[19] In original.
[20] In original.
[21] In original.
[22] Rec. Doc. No. 130, p. 57–58.

Citigroup Global Markets Trader: yeah i have 14mm left but we do have more fees [;] 99.875 ftt

Mizuho Securities Trader: Cool

Citigroup Global Markets Trader: FTT ON THE 10/1

Mizuho Securities Trader: ftt at 99.875 got it[23]

As to Plaintiff's LUTPA claims, Plaintiff asserts that Mizuho "engaged in deceptive business practices regarding the advertisement of their brokerage services, including making false statements regarding the use of their experience and skill in recommending investments."[24]

As to Plaintiff's negligence claims, Plaintiff alleges that Mizuho owed a duty to ensure that the investments that they offered were suitable for Plaintiff and a duty to exercise reasonable care in recommending investments to Plaintiff.[25] Plaintiff avers that it relied on Mizuho's representations of its skill and experience when Plaintiff "awarded them contracts to sell securities to the State of Louisiana."[26] Plaintiff argues that Mizuho breached its duties by selling Plaintiff bonds whose prices had been artificially inflated.[27] Moreover, Plaintiff avers that Mizuho should have known that the prices were artificially inflated and its failure to recognize that and avoid selling the bonds at inflated prices to Plaintiff was a breach of Mizuho's duty to exercise reasonable care.[28]

Plaintiff requests treble damages, a permanent injunction restraining Mizuho from engaging in anticompetitive conduct, costs, attorneys' fees, and expert fees.[29]

---

[23] *Id*. at 56–57.
[24] *Id*. at 90.
[25] *Id*. at 87.
[26] *Id*. at 89.
[27] *Id*.
[28] *Id*. at 89–90.
[29] *Id*. at 98.

65648

### III.    LAW AND ANALYSIS

### A.  Rule 12(b)(6) Motion to Dismiss

When deciding a Rule 12(b)(6) motion to dismiss, "[t]he 'court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.'"[30] The Court may consider "the complaint, its proper attachments, 'documents incorporated into the complaint by reference, and matters of which a court may take judicial notice.'"[31] "To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead 'enough facts to state a claim to relief that is plausible on its face.'"[32]

In *Twombly*, the United States Supreme Court set forth the basic criteria necessary for a complaint to survive a Rule 12(b)(6) motion to dismiss. "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."[33] A complaint is also insufficient if it merely "tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"[34] However, "[a] claim has facial plausibility when the plaintiff pleads the factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[35] In order to satisfy the plausibility standard, the plaintiff must show "more than a sheer possibility that the defendant has

---

[30] *In re Katrina Canal Breaches Litigation*, 495 F.3d 191, 205 (5th Cir. 2007) (quoting *Martin v. Eby Constr. Co. v. Dallas Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004)).

[31] *Randall D. Wolcott, M.D., P.A. v. Sebelius*, 635 F.3d 757, 763 (5th Cir. 2011) (quoting *Dorsey v. Portfolio Equity, Inc.*, 540 F. 3d 333, 338 (5th Cir. 2008).

[32] *In re Katrina Canal Breaches Litigation*, 495 F.3d at 205 (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

[33] *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations and brackets omitted) (hereinafter *Twombly*).

[34] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citations omitted) (hereinafter "*Iqbal*").

[35] *Id.*

acted unlawfully."[36] "Furthermore, while the court must accept well-pleaded facts as true, it will not 'strain to find inferences favorable to the plaintiff.'"[37] "[O]n a motion to dismiss, courts 'are not bound to accept as true a legal conclusion couched as a factual allegation.'"[38]

### B. Standing: Sherman Act Claims

Plaintiff must have standing to pursue an antitrust suit. Plaintiff must plead: (1) injury-in-fact—meaning an injury proximately caused by the Defendants' conduct; (2) antitrust injury; and (3) proper plaintiff status, "'which assures that other parties are not better situated to bring suit.'"[39] Antitrust injury is "'injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation.'"[40] "Typically, parties with antitrust injury are either competitors, purchasers, or consumers in the relevant market."[41] The "proper plaintiff" inquiry examines "(1) whether the plaintiff's injuries or their causal link to the defendant are speculative, (2) whether other parties have been more directly harmed, and (3) whether allowing this plaintiff to sue would risk multiple lawsuits, duplicative recoveries, or complex damage apportionment."[42] "In determining antitrust standing, [the Court] assumes the existence of an antitrust violation."[43]

---

[36] *Id.*
[37] *Taha v. William Marsh Rice University*, 2012 WL 1576099 at *2 (S.D. Tex. May 3, 2013) (quoting *Southland Sec. Corp. v. Inspire Ins. Solutions, Inc.*, 365 F.3d 353, 361 (5th Cir. 2004).
[38] *Twombly*, 550 U.S. at 556 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).
[39] *Waggoner v. Denbury Onshore, L.L.C.*, 612 F. App'x 734, 736 (5th Cir. 2015) (quoting *Doctor's Hosp. of Jefferson, Inc. v. Se. Med. Alliance, Inc.*, 123 F.3d 301, 305 (5th Cir.1997)).
[40] *Id*. at 737 (quoting *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489 (1977)).
[41] *Id*.
[42] *Norris v. Hearst Tr.*, 500 F.3d 454, 465 (5th Cir. 2007).
[43] *Harry v. Total Gas & Power N. Am., Inc.*, 889 F.3d 104, 115 (2d Cir. 2018) (internal citations omitted).

The second and third prongs of the antitrust standing inquiry are not seriously in dispute. Plaintiff's alleged injury is that it overpaid for bonds it bought and was underpaid for bonds it sold because of Mizuho's alleged conspiracy to fix prices. This suffices to establish antitrust injury. As to the proper plaintiff inquiry, Plaintiff alleges that it was a consumer in the allegedly price fixed market. Plaintiff, as the alleged purchaser of the allegedly price fixed bonds, is the party most directly harmed. Finally, allowing Plaintiff to sue over two-party bond transactions it entered into does not risk multiple lawsuits, duplicative recoveries, or complex damage apportionment.

The first prong, injury-in-fact, is in dispute. The injury-in-fact inquiry focuses on the "directness or indirectness of the asserted injury."[44] Plaintiff must allege that the "antitrust violation . . . cause[d] injury to the antitrust plaintiff."[45] "In a case involving a conspiracy to fix prices, the plaintiff must prove that the conspiracy in fact affected the prices paid."[46] Courts have found no injury where the plaintiff failed to allege any specific transactions that it entered into that harmed it.[47]

Mizuho argues, correctly, that Plaintiff does not allege that it purchased the bonds at issue in the Mizuho-Stifel chat or the Mizuho-FTN-Citigroup chat.[48] This is Plaintiff's third *Complaint* yet it still fails to allege that it purchased the bonds made the subject of Mizuho's purported chatroom conversations. Thus, the causation between Plaintiff's

---

[44] *Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 540 (1983).

[45] *Nichols v. Mobile Bd. of Realtors, Inc.*, 675 F.2d 671, 675 (5th Cir. 1982); *Robinson v. Texas Auto. Dealers Ass'n*, 387 F.3d 416, 422 (5th Cir. 2004).

[46] *In re Corrugated Container Antitrust Litig.*, 756 F.2d 411, 416 (5th Cir. 1985).

[47] See *In re SSA Bonds Antitrust Litig.*, 2018 WL 4118979, at *6 (S.D.N.Y. Aug. 28, 2018); *Harry v. Total Gas & Power N. Am., Inc.*, 244 F. Supp. 3d 402, 416 (S.D.N.Y. 2017) ("The plaintiffs' failure to allege a single specific transaction that lost value as a result of the defendants' alleged misconduct precludes a plausible allegation of actual injury"), *aff'd as modified on other grounds*, 889 F.3d 104 (2d Cir. 2018).

[48] Rec. Doc. No. 152-1, p. 8.

injuries, buying price fixed bonds and/or selling bonds at a supposedly depressed price, and Mizuho's alleged injury causing act, is attenuated.

Plaintiff relies on its market analysis allegations as probative of the possibility of a conspiracy pervasive enough to affect some of Plaintiff's transactions. Plaintiff alleges that it entered into billions of dollars in GSE bond transactions from July 1, 2010 to June 30, 2011 and from July 1, 2012 to June 30, 2013 with Defendants.[49]  Plaintiff also alleges pricing data that suggests artificially inflated bid-ask spreads, a higher price charged by the Defendants to Plaintiff and others similarly situated during the conspiracy period as compared to after, and price fixing on bonds set to go off the run.[50] While these allegations when assumed true may support the possibility of a market-wide conspiracy, the market analyses relied upon by the Plaintiff fails to distinguish between the Defendants. The blanket label of "Defendants" is insufficient for the Court to find plausibility as to Mizuho. The lack of an allegation as to Mizuho's market share exacerbates this problem.[51] Because Plaintiff does not allege Mizuho's market share, it is impossible to determine the extent, if any, that Mizuho's alleged pricing behavior influenced market prices. While the pricing data may be suggestive of market-wide anticompetitive pricing, there are no allegations which plausibly indicate that every bond Mizuho transacted in was anticompetitively priced such that it can plausibly be inferred that the bonds Plaintiff transacted with Mizuho were anticompetitively priced.

Besides the chatroom conversation, Plaintiff's allegations related to Mizuho are limited to: standard allegations of Mizuho's type of business and place of business;[52] a

---

[49] Rec. Doc. No. 130, p. 81–84.
[50] *Id*. at p. 65–75.
[51] *Id*. at p. 36.
[52] *Id*. at p. 27.

bare allegation that Mizuho sold bonds to Plaintiff between 2009 and 2016;[53] an allegation that Mizuho was an Approved Bond Dealer between 2009 and 2016;[54] and, an allegation that Plaintiff purchased $50,000,000 in bonds from Mizuho between July 12, 2012 and June 30, 2013.[55] So, while the *Second Amended Complaint* alleges that Mizuho participated in the broader conspiracy and the extent of that participation, the Court finds that these allegations do not cross the threshold between mere possibility and plausibility.

The allegations as to Mizuho are limited to the chatroom conversations with Mizuho, FTN, Citigroup, and Stifel and do not implicate Mizuho's participation in a broader market-wide conspiracy because of Plaintiff's reliance on group pleading. Although Plaintiff alleges that Mizuho engaged in price fixing as to two bonds, there is nothing to connect those bonds or Mizuho to a broader scheme. Plaintiff does not allege that it bought the bonds at issue in the chatroom conversations. Because there are no allegations plausibly suggesting Mizuho was part of the alleged market-wide conspiracy, the market-wide analyses of pricing data that suggest a conspiracy do not implicate Mizuho. As such, Plaintiff's well-pleaded allegations as to Mizuho are limited to the assertion that it price fixed two bonds and that Plaintiff entered into bonds transactions with Mizuho in the same year one of those chatroom conversations occurred. Courts have held that similar allegations where the plaintiff alleges that it bought a bond from a defendant in the same 24-hour period the alleged price fixing occurred were insufficient to infer plausible actual damages.[56] That reasoning applies with greater force here.

---

[53] *Id*.
[54] *Id*. at 28.
[55] *Id*. at 82.
[56] *In re SSA Bonds Antitrust Litig*., 2018 WL 4118979, at *6–7 (S.D.N.Y. Aug. 28, 2018) (collecting cases).

Plaintiff has failed to plausibly plead injury-in-fact, and as such, antitrust standing. Mizuho's *Motion* is granted as to Plaintiff's antitrust claims.

### C.  LUTPA Claim[57]

Plaintiff's LUTPA claim cannot survive Mizuho's *Motion to Dismiss*. The LUTPA prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce . . . ."[58] "Louisiana has left the determination of what is an 'unfair trade practice' largely to the courts to decide on a case-by-case basis."[59] "The courts have repeatedly held that, under this statute, the plaintiff must show the alleged conduct 'offends established public policy and ... is immoral, unethical, oppressive, unscrupulous, or substantially injurious.'"[60] The Louisiana Supreme Court has explained that "the range of prohibited practices under LUTPA is extremely narrow."[61] Further, the United States Court of Appeals for the Fifth Circuit has held that "the statute does not provide an alternate remedy for simple breaches of contract. There is a great deal of daylight between a breach of contract claim and the egregious behavior the statute proscribes."[62]

The LUTPA contains an exception for:

> Any federally insured financial institution, its subsidiaries, and affiliates or any licensee of the Office of Financial Institutions, its subsidiaries, and affiliates or actions or transactions subject to the jurisdiction of the Louisiana Public Service Commission or other public utility regulatory body, the commissioner of financial institutions, the insurance commissioner, the

---

[57] Neither party addresses whether Plaintiffs have standing under the LUTPA. The Court will assume for the purposes of this *Ruling* that Plaintiffs have standing; however, the Court notes that *Cheramie Services Inc. v. Shell*, which expanded LUTPA standing, was a *plurality* opinion of the Louisiana Supreme Court.
[58] La. R.S. § 51:1405(A).
[59] *Turner v. Purina Mills, Inc.*, 989 F.2d 1419, 1422 (5th Cir. 1993); *Cheramie Services, Inc. v. Shell Deepwater Production, Inc.*, 35 So.3d 1053, 1059 (La. 2010) ("It has been left to the courts to decide, on a case-by-case basis, what conduct falls within the statute's prohibition.").
[60] *Cheramie*, 35 So.3d at 1059 (citations omitted).
[61] *Id.* at 1060.
[62] *Turner*, 989 F.2d at 1422.

financial institutions and insurance regulators of other states, or federal banking regulators who possess authority to regulate unfair or deceptive trade practices.[63]

Mizuho argues that this exception applies because its affiliate, Mizuho Bank (USA), is a federally insured bank and because Mizuho itself is licensed by the Louisiana Office of Financial Institutions.[64] Plaintiff does not dispute this, and in fact, asserts that Mizuho is licensed in Louisiana. [65] Moreover, Mizuho asks this court to take judicial notice of the fact that Mizuho Bank is a federally insured bank.[66] The Court takes judicial notice of that fact.[67] Plaintiff argues that the exception does not apply because Mizuho is regulated by the Financial Industry Regulatory Authority ("FINRA").[68] Because Plaintiff does not dispute Mizuho's arguments, it concedes them.[69] Instead, Plaintiff relies on *Grant v. Houser*, a case from the Eastern District of Louisiana, for its argument that because Mizuho is regulated by FINRA, the exception does not apply.[70]

In *Grant*, the court considered the defendant's argument that because it was registered with FINRA, it was exempt from the LUTPA.[71] The court concluded that FINRA registration was not a ground for the exception in La. R.S. § 51:1406(1), so the exception

---

[63] La. R.S. § 51:1406(1).

[64] Rec. Doc. No. 152-1, p. 20.

[65] Rec. Doc. No. 158-1, p. 19–21. Plaintiff alleges in the *Second Amended Complaint* that Mizuho "is licensed to do business in all 50 states." Rec. Doc. No. 130, p. 27.

[66] Rec. Doc. No. 152-1, p. 20, n. 5.

[67] See FDIC: BankFind – Mizuho Bank (USA), https://research2.fdic.gov/bankfind/detail.html?bank=21843&name=Mizuho%20Bank%20(USA)&searchName=mizuho&searchFdic=&city=&state=&zip=&address=&searchWithin=&activeFlag=&searchByTradename=false&tabId=2.
The Court may take judicial notice of public records, including government websites, for the purpose of a Rule 12(b)(6) motion. *Davis v. Bayless*, 70 F.3d 367, 372 n.3 (5th Cir. 1995).

[68] Rec. Doc. No. 158-1, p. 16–21; *Grant v. Houser*, 2013 WL 2631433, at *4 (E.D. La. June 11, 2013).

[69] *Dipietro v. Cole*, No. CV 16-566-SDD-RLB, 2017 WL 5349492, at *3 (M.D. La. Nov. 13, 2017); *Omega Hosp., LLC v. United Healthcare Servs., Inc.*, 345 F. Supp. 3d 712, 740 (M.D. La. 2018).

[70] Rec. Doc. No. 158-1, p. 15–16; *Grant v. Houser*, 2013 WL 2631433, at *4 (E.D. La. June 11, 2013).

[71] *Grant*, 2013 WL 2631433, at *4.

did not apply.[72] The court did not conclude, however, that FINRA registration categorically barred the application of the exception, which is what Plaintiff asks this Court to hold.[73]

There is nothing in the exception to the LUTPA provided by La. R.S. § 51:1406(1) that excludes FINRA-regulated entities from its scope. In contrast, § 51:1406(1) contains broad language excluding from the LUTPA's application "[a]ny federally insured financial institution, its subsidiaries, and affiliates or any licensee of the Office of Financial Institutions, its subsidiaries…." As such, because Mizuho is an affiliate of a federally insured bank and licensed to do business in Louisiana, it is exempt from the LUTPA. This result accords with the purpose behind the exception which is to "'avoid duplication and exclude financial institutions which are regulated by other authorities as to unfair or deceptive trade practices.'"[74] Mizuho's registration with the Louisiana Office of Financial Institutions places it under that Office's jurisdiction, and Mizuho's affiliate's status as a federally insured bank compels its adherence to a bevy of federal statutes and regulations. Plaintiff's LUTPA claim is therefore dismissed.

### D. Plaintiff's Negligence Claim

Plaintiff must allege five elements to state a claim for negligence:

> (1) the defendant had a duty to conform his conduct to a specific standard (the duty element); (2) the defendant's conduct failed to conform to the appropriate standard (the breach element); (3) the defendant's substandard conduct was a cause in fact of the plaintiff's injuries (the cause-in-fact element); (4) the defendant's substandard conduct was a legal cause of the plaintiff's injuries (the scope of liability or scope of protection element); and (5) the actual damages (the damages element).[75] . . . A negative answer to

---

[72] *Id*. at *4–5.

[73] *Id*.

[74] *Mariche v. Wells Fargo Bank, N.A.*, 2012 WL 1057626, at *2 (E.D. La. Mar. 28, 2012) (citing *Carriere v. Proponent Federal Credit Union*, 2004 WL 1638250 at *7 (W.D. La. July 12, 2004)).

[75] *Audler v. CBC Innovis Inc.*, 519 F.3d 239, 249 (5th Cir. 2008) (citing *Lemann v. Essen Lane Daiquiris*, 923 So.2d 627, 633 (La.2006)).

any of the inquiries of the duty-risk analysis results in a determination of no liability.[76]

First, the Court must consider if Plaintiff has adequately alleged that Mizuho owed it a duty.[77] "In deciding whether to impose a duty in a particular case, Louisiana courts examine 'whether the plaintiff has any law (statutory, jurisprudential, or arising from general principles of fault) to support the claim that the defendant owed him a duty.'"[78]

Plaintiff asserts that Mizuho's alleged capacity as a broker created fiduciary duties to Plaintiff. Plaintiff also alleges that Mizuho's alleged capacity as a financial advisor created duties to Plaintiff. Finally, Plaintiff alleges that FINRA regulations created duties to Plaintiff.  Plaintiff asserts that Mizuho had the duties to: "ensure that the investments that they offered or brokered were suitable for the Plaintiffs [sic] as a client," "avoid unreasonable behavior which puts a client at risk of financial harm," and "use reasonable care in recommending investments to the Plaintiffs [sic]," and "avoid recommending investments which it knew or should have known would constitute a fraud or scam."[79]

Plaintiff relies on *Beckstrom v. Parnell*,[80] a 1998 Louisiana Fifth Circuit Court of Appeal case, and *Romano v. Merrill Lynch, Pierce, Fenner & Smith*,[81] a United States Fifth Circuit Court of Appeal case from 1987, in support of its assertion that Mizuho's status as a broker gave rise to a duty to Plaintiff. The *Beckstrom* court noted that, "[a]s a general rule, a broker has a duty to give a full and fair disclosure. However, depending on the customer-broker relationship, the nature of the transaction, and the sophistication

---

[76] *Id*. (citing *Mathieu v. Imperial Toy Corp.*, 646 So.2d 318, 321 (La. 1994)).
[77] *Id*. (citing *Meany v. Meany*, 639 So.2d 229, 233 (La. 1994)).
[78] *Id*. (citing *Faucheaux v. Terrebonne Consol. Gov't*, 615 So.2d 289, 292 (La. 1993)).
[79] Rec. Doc. No. 158-1, p. 18.
[80] 730 So. 2d. 942, 949 (La. App. 1 Cir. 11/6/98).
[81] 834 F.2d 523, 530 (5th Cir. 1987).

of the consumer, the duty can change."[82] The *Romano* court held in similar fashion, noting

that "a broker does owe his client a fiduciary duty" but "[i]t is clear that the nature of the

fiduciary duty owed will vary depending on the relationship between the broker and the

investor."[83] The court further noted that the discretionary or non-discretionary nature of

the account is a factor as is the allocation of the control over the account.[84]

In a subsequent case, *Matter of Life Partners Holdings*, the Fifth Circuit noted that

"the duty owed is contingent on the nature of the fiduciary relationship, [so] the plaintiff

must plead some facts as to the nature of the relationship to state a plausible claim that

[] a fiduciary duty has been breached."[85] The court favorably quoted an Eleventh Circuit

case for the proposition that "the duty to disclose information about risk will vary

depending on the circumstances and nature of the relationship."[86]

Applying the above precepts, the Fifth Circuit affirmed the district court's dismissal

under 12(b)(6). The court noted:

> The third amended complaint does not contain any allegations regarding
> the relationship between any specific Licensee and any specific investor.
> Importantly, it does not state facts regarding "the degree of trust" placed in
> the Licensee or "the intelligence and personality" of the investor, so the
> nature of the fiduciary duty owed cannot be ascertained from the pleadings.
> As a result, the third amended complaint does not provide sufficient facts to
> allege that any fiduciary duty has been breached by any individual
> Licensee.[87]

Plaintiff alleges that Mizuho "entered into contracts with the State of Louisiana to

broker the purchaser of [GSE bonds]…"[88] Plaintiff further asserts that "Louisiana entered

---

[82] *Beckstrom*, 730 So.2d at 948.
[83] *Romano*, 834 F.2d at 530.
[84] *Id*.
[85] *Matter of Life Partners Holdings, Inc*., 926 F.3d 103, 125 (5th Cir. 2019).
[86] *Id*. (quoting *Clayton Brokerage Co. v. Commodity Futures Trading Comm'n*, 794 F.2d 573, 582 (11th Cir. 1986)).
[87] *Id*.
[88] Rec. Doc. No. 130, p. 86.

65648

into contracts to purchase [GSE bonds] based upon the recommendations from …

[Mizuho]" and that Mizuho acted as brokers for those transactions.[89] Plaintiff alleges that

it "relied upon the skill and expertise claimed by [Mizuho] in the selection of the securities

purchased in transactions brokered by these companies."[90]

As in *Matter of Life Partner Holdings*, Plaintiff has failed to state facts regarding the

"degree of trust" placed in Mizuho and the "intelligence and personality" of the investor.[91]

Plaintiff has also failed to allege whether the accounts that it held with Mizuho were

discretionary or nondiscretionary. Rather, Plaintiff alleges that it acted on Mizuho's

"recommendations," which suggests that Mizuho merely offered advice. Somewhat

contradictorily, Plaintiff seems to argue that Mizuho "selected" the securities, but it is

unclear whether the allegation is that Mizuho selected the securities to recommend or

bought them on Plaintiff's behalf, as would occur in a nondiscretionary account. While

Plaintiff alleges that it contracted with Mizuho for them to broker the purchase of bonds

for Plaintiff, the terms of those contracts are nowhere to be found in the *Second Amended*

*Complaint*. In sum, Plaintiff's allegations as to its relationship with Mizuho offer no basis

from which the Court may determine what degree of control any party exercised in the

transactions or over the accounts. *Romano* and *Matter of Life Partner Holdings* mandate

that Plaintiff's lack of specificity in the *Second Amended Complaint* is insufficient to define

the nature of the fiduciary duty owed.

---

[89] *Id*. at 87.
[90] *Id*. at 89.
[91] *Matter of Life Partners Holdings, Inc*., 926 F.3d at 125.

65648

Plaintiff also asserts that both the Louisiana Supreme Court's decision in *Roger v. Dufrene*[92] and the Fifth Circuit's decision in *Copeland v. Wasserstein, Perella & Co. Inc.*[93] support the principle that a duty of "reasonable diligence" exists for financial advisors.[94] *Rogers*, since it concerns the duties of an insurance agent, does not support that proposition, but *Copeland* does. The *Copeland* court had to determine whether the plaintiff's cause of action against his financial advisor arose in contract or tort for prescription purposes.[95] *Copeland* cited *Rogers* for the proposition that certain professionals only promise to "employ ordinary skill and care in the exercise of the particular profession" and included financial advisors in that category.[96] In other words, *Copeland* stands for the unsurprising principle that financial advisors must advise their clients "in accordance with the standard of care among financial advisors."[97]

Plaintiff's scant pleading dooms this theory as well. Plaintiff does not allege that Mizuho acted as a financial advisor. Beyond the vague and conclusory allegations that Mizuho "recommended" or "selected" bonds for Plaintiff, there is no indication that Mizuho did anything more than broker the transactions. In sum, Plaintiff's word choice, and inconsistent word choice at that, is the only allegation supporting the notion that Mizuho acted as a financial advisor. Plaintiff's *Second Amended Complaint* is devoid of substantive factual allegations that satisfy the plausibility standard consistent with its argument that Mizuho acted as a financial advisor, which was raised for the first time in Plaintiff's *Opposition*.

---

[92] 613 So.2d 947 La. 1993).
[93] 278 F.3d 472 (5th Cir. 2002).
[94] Rec. Doc. No. 158-1, p. 20–22.
[95] 278 F.3d at 479.
[96] *Id*.
[97] *Id*.

Finally, Plaintiff asserts that several FINRA regulations create the aforementioned duties to Plaintiff. Plaintiff argues that FINRA requires its members to disclose material information about investments to investors, to only recommend "suitable" investments to customers and to provide the customer with the most favorable price under prevailing market conditions.[98] However, these arguments alone do not persuade the Court that FINRA regulations give rise to a duty to Plaintiff. Plaintiff provides no authority to support its claim that FINRA regulations can give rise to such a duty.[99] Mizuho cites to persuasive authority that find that FINRA regulations do not give rise to a duty.[100]

Courts have generally held that violation of a FINRA or NSAD[101] rule does not create a private right of action because to do so would go against Congress's intent when passing the Securities Exchange Act.[102] When presented with an opportunity to confront this issue, the Fifth Circuit explicitly declined to rule but instead stated that the rules could be evidence of the broker's standard of care.[103]

Even assuming FINRA regulations may give rise to a duty, the Court finds that Plaintiff has failed to allege a breach of any duty. Plaintiff argues that Mizuho breached when it: (1) "failed to provide investment advice in the State of Louisiana's best interest"; (2) "continued to participate in an antitrust conspiracy for their own benefit and at the experienced [sic] of [Louisiana]"; (3) "failed to disclose material facts concerning the

---

[98] Rec. Doc. No. 158-1, p. 18–22.

[99] Rec. Doc. No. 158-1, p. 18–22.

[100] Rec. Doc. No. 171, p. 9–10.

[101] The National Association of Securities Dealers and FINRA's predecessor. *In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, No. 1446, 2016 WL 4095973, at *14 (S.D. Tex. Aug. 2, 2016), *aff'd sub nom. Giancarlo v. UBS Fin. Servs., Inc.*, 725 F. App'x 278 (5th Cir. 2018).

[102] See *Brink v. Raymond James & Assocs., Inc.*, 341 F. Supp. 3d 1314, 1324–26 (S.D. Fla. 2018) (collecting cases).

[103] *Miley v. Oppenheimer & Co., Inc.*, 637 F.2d 318, 333 (5th Cir. 1981), *abrogated on other grounds by Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213 (1985).

pricing and marketing of GSE bonds"; (4) "purchased and sold artificially priced securities on behalf of the State of Louisiana"; and (5) "breach[ed their] own purported guidelines and standards for rendering investment advice and services…"[104]

Plaintiff's first argument fails. This argument is predicated on the assertion that the bonds it bought from Mizuho could not have been in Plaintiff's best interest because they were price fixed. But Plaintiff has not alleged that it bought bonds that were price fixed from Mizuho. Rather, Plaintiff alleges that Mizuho fixed the price of at least two bonds and that Plaintiff bought bonds from Mizuho. But Plaintiff does not adequately allege a causal link between Mizuho's alleged price fixing and its injury. Moreover, Plaintiff does not allege the content and timing of Mizuho's alleged advice to Plaintiff. Without the content of the advice, the allegation that said advice was not in Plaintiff's best interests is conclusory and speculative. Thus, Plaintiff's first argument fails.

Similarly, as to Plaintiff's third and fourth arguments, while Plaintiff has alleged that Mizuho should have known that the bonds it sold were price fixed because all bonds in the market were allegedly price fixed, Plaintiff proffers no allegations as to how or why Mizuho could have known about a market-wide conspiracy. Plaintiff's allegations regarding Mizuho's knowledge of the alleged price fixing are limited to the two chatroom conversations which do not establish that Mizuho was a member of the broader conspiracy for the reasons stated above. On the contrary, Plaintiff argues that the conspiracy "was inherently self-concealing" and avers that it could not have discovered the price fixing until June 2018.[105] Plaintiff provides no explanation for why it could not discover the conspiracy, but Mizuho could, besides conclusory assertions that Mizuho

---

[104] Rec. Doc. No. 158-1, p. 21–22.
[105] Rec. Doc. No. 130, p. 92.

was a member of the conspiracy. Plaintiff has failed to allege that Mizuho knowingly sold it price fixed bonds or that Mizuho knew about the alleged market-wide conspiracy. For these reasons, Plaintiff's third and fourth arguments fail.

As to Plaintiff's second argument, Plaintiff has failed to state a Sherman Act claim because Plaintiff has not alleged a sufficient injury-in-fact. As such, because Plaintiff has failed to allege a Sherman Act claim, it cannot now maintain that Mizuho can be liable in negligence for participating in an antitrust conspiracy. The contrary rule would allow plaintiffs to skirt the requirements of antitrust standing and assert an antitrust claim without following the doctrinal prerequisites. Furthermore, as noted above, Plaintiff has not sufficiently alleged that Mizuho was part of the broader conspiracy. Additionally, Plaintiff cannot show that it has any damages from Mizuho's alleged participation in the conspiracy for the reasons noted above.

Finally, Plaintiff alleges Mizuho "breach[ed their] own purported guidelines and standards for rendering investment advice and services…"[106] However, Plaintiff does not allege the content of Mizuho's purported guidelines and standards. Since Plaintiff has failed to allege what Mizuho's alleged guidelines and standards are, the Court cannot infer that Mizuho breached its guidelines and standards.

For the foregoing reasons, Plaintiff has failed to allege a negligence claim and that claim is dismissed.

---

[106] Rec. Doc. No. 158-1, p. 21.

65648

**IV.    CONCLUSION**

For the reasons provided above, Mizuho's *Motion*[107] is granted. This is now Plaintiff's third *Complaint.* There is no reason to believe that on a fourth try, Plaintiff would finally cure these deficiencies. As such, Plaintiff's action as to Mizuho is dismissed with prejudice.

**IT IS SO ORDERED.**

Signed in Baton Rouge, Louisiana on <u>March 31, 2021</u>.


_____
**JUDGE SHELLY D. DICK**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

---

[107] Rec. Doc. No. 152.

65648